# McNALLY v. UNITED STATES

No. 86-234.   Argued April 22, 1987—Decided June 24, 1987*

---

*Together with No. 86-286, *Gray* v. *United States*, also on certiorari to the same court.

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, MARSHALL, BLACKMUN, POWELL, and SCALIA, JJ., joined. STEVENS, J., filed a dissenting opinion, in Parts I, II, and III of which O'CONNOR, J., joined, *post*, p. 362.

*Carter G. Phillips* argued the cause for petitioners in both cases. With him on the briefs for petitioner in No. 86–286 were *James A. Shuffett, William E. Johnson,* and *Benjamin W. Heineman, Jr. Frank E. Haddad, Jr.,* filed briefs for petitioner in No. 86–234.

*Deputy Solicitor General Ayer* argued the cause for the United States in both cases. With him on the brief were *Solicitor General Fried, Assistant Attorney General Weld, Christopher J. Wright,* and *Sara Criscitelli.*

JUSTICE WHITE delivered the opinion of the Court.

This action involves the prosecution of petitioner Gray, a former public official of the Commonwealth of Kentucky, and petitioner McNally, a private individual, for alleged violation of the federal mail fraud statute, 18 U. S. C. § 1341.[1] The prosecution's principal theory of the case, which was accepted by the courts below, was that petitioners' participation in a self-dealing patronage scheme defrauded the citizens and government of Kentucky of certain "intangible rights," such as the right to have the Commonwealth's affairs conducted honestly. We must consider whether the jury charge permitted a conviction for conduct not within the scope of the mail fraud statute.

We accept for the sake of argument the Government's view of the evidence, as follows. Petitioners and a third individual, Howard P. "Sonny" Hunt, were politically active in the Democratic Party in the Commonwealth of Kentucky during the 1970's. After Democrat Julian Carroll was elected Governor of Kentucky in 1974, Hunt was made chairman of the state Democratic Party and given *de facto* control over selecting the insurance agencies from which the Commonwealth would purchase its policies. In 1975, the Wombwell Insurance Company of Lexington, Kentucky (Wombwell), which since 1971 had acted as the Commonwealth's agent for securing a workmen's compensation policy, agreed with Hunt that in exchange for a continued agency relationship it would share any resulting commissions in excess of $50,000 a year with other insurance agencies specified by him. The commissions in question were paid to Wombwell by the large in-

---

[1] Section 1341 provides in pertinent part:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, [uses the mails or causes them to be used], shall be fined not more than $1,000 or imprisoned not more than five years, or both."

surance companies from which it secured coverage for the Commonwealth.

From 1975 to 1979, Wombwell funneled $851,000 in commissions to 21 separate insurance agencies designated by Hunt. Among the recipients of these payments was Seton Investments, Inc. (Seton), a company controlled by Hunt and petitioner Gray and nominally owned and operated by petitioner McNally.

Gray served as Secretary of Public Protection and Regulation from 1976 to 1978 and also as Secretary of the Governor's Cabinet from 1977 to 1979. Prior to his 1976 appointment, he and Hunt established Seton for the sole purpose of sharing in the commissions distributed by Wombwell. Wombwell paid some $200,000 to Seton between 1975 and 1979, and the money was used to benefit Gray and Hunt. Pursuant to Hunt's direction, Wombwell also made excess commission payments to the Snodgrass Insurance Agency, which in turn gave the money to McNally.

On account of the foregoing activities, Hunt was charged with and pleaded guilty to mail and tax fraud and was sentenced to three years' imprisonment. Petitioners were charged with one count of conspiracy and seven counts of mail fraud, six of which were dismissed before trial.[2] The remaining mail fraud count was based on the mailing of a commission check to Wombwell by the insurance company from which it had secured coverage for the State. This count alleged that petitioners had devised a scheme (1) to defraud the citizens and government of Kentucky of their right to have the Commonwealth's affairs conducted honestly, and (2) to obtain, directly and indirectly, money and other things

---

[2] The six counts dismissed were based on the mailing of Seton's tax returns. The Court of Appeals held that mailings required by law cannot be made the basis for liability under § 1341 unless the documents are themselves false, see *Parr* v. *United States*, 363 U. S. 370 (1960), and that the six counts were properly dismissed since the indictment did not allege that Seton's tax returns were false. The Government has not sought review of this holding.

of value by means of false pretenses and the concealment of material facts.[3] The conspiracy count alleged that petitioners had (1) conspired to violate the mail fraud statute through the scheme just described and (2) conspired to defraud the United States by obstructing the collection of federal taxes.

After informing the jury of the charges in the indictment,[4] the District Court instructed that the scheme to defraud the

[3] The mail fraud count also alleged that petitioners' fraudulent scheme had the purpose of defrauding the citizens and government of Kentucky of their right to be made aware of all relevant facts when selecting an insurance agent to write the Commonwealth's workmen's compensation insurance policy. The District Court did not instruct on this purpose, holding that it was subsumed in the purpose to deny the right to honest government.

[4] The instruction summarized the charges as follows:

"Count 4 of the Indictment charges in part that the defendants devised a scheme or artifice to:

"(a)(1) defraud the citizens of the Commonwealth of Kentucky and its governmental departments, agencies, officials and employees of their right to have the Commonwealth's business and its affairs conducted honestly, impartially, free from corruption, bias, dishonesty, deceit, official misconduct, and fraud; and,

"(2) obtain (directly and indirectly) money and other things of value, by means of false and fraudulent pretenses, representations, and promises, and the concealment of facts.

"And for the purpose of executing the aforesaid scheme, the defendants, James E. Gray and Charles J. McNally, and Howard P. 'Sonny' Hunt, Jr., and others, did place and cause to be placed in a post office or authorized deposit for mail matter, matters and things to be sent and delivered by the Postal Service, and did take and receive and cause to be taken and received therefrom such matters and things and did knowingly cause to be delivered thereon and at the place at which it was directed to be delivered by the person to whom it was addressed, matters and things.

"(b) Defraud the United States by impeding, impairing, and obstructing and defeating the lawful governmental functions of the Internal Revenue Service of the Treasury Department of the United States of America in the ascertainment, computation, assessment and collection of federal taxes." Brief for United States 9–10, n. 8.

The Government concedes that it was error for the District Court to include the instruction on tax fraud in the substantive mail fraud instruction, see id., at 11, n. 9, but the effect of that error is not now at issue.

citizens of Kentucky and to obtain money by false pretenses and concealment could be made out by either of two sets of findings: (1) that Hunt had *de facto* control over the award of the workmen's compensation insurance contract to Wombwell from 1975 to 1979; that he directed payments of commissions from this contract to Seton, an entity in which he had an ownership interest, without disclosing that interest to persons in state government whose actions or deliberations could have been affected by the disclosure; and that petitioners, or either of them, aided and abetted Hunt in that scheme; or (2) that Gray, in either of his appointed positions, had supervisory authority regarding the Commonwealth's workmen's compensation insurance at a time when Seton received commissions; that Gray had an ownership interest in Seton and did not disclose that interest to persons in state government whose actions or deliberations could have been affected by that disclosure; and that McNally aided and abetted Gray (the latter finding going only to McNally's guilt).

The jury convicted petitioners on both the mail fraud and conspiracy counts, and the Court of Appeals affirmed the convictions. 790 F. 2d 1290 (CA6 1986). In affirming the substantive mail fraud conviction, the court relied on a line of decisions from the Courts of Appeals holding that the mail fraud statute proscribes schemes to defraud citizens of their intangible rights to honest and impartial government. See, *e. g., United States* v. *Mandel,* 591 F. 2d 1347 (CA4 1979), aff'd in relevant part, 602 F. 2d 653 (en banc), cert. denied, 445 U. S. 961 (1980). Under these cases, a public official owes a fiduciary duty to the public, and misuse of his office for private gain is a fraud. Also, an individual without formal office may be held to be a public fiduciary if others rely on him " 'because of a special relationship in the government' " and he in fact makes governmental decisions. 790 F. 2d, at 1296 (quoting *United States* v. *Margiotta,* 688 F. 2d 108, 122 (CA2 1982), cert. denied, 461 U. S. 913 (1983)). The Court of Appeals held that Hunt was such a

fiduciary because he "substantially participated in governmental affairs and exercised significant, if not exclusive, control over awarding the workmen's compensation insurance contract to Wombwell and the payment of monetary kickbacks to Seton." 790 F. 2d, at 1296.

We granted certiorari, 479 U. S. 1005 (1986), and now reverse.

The mail fraud statute clearly protects property rights, but does not refer to the intangible right of the citizenry to good government. As first enacted in 1872, as part of a recodification of the postal laws, the statute contained a general proscription against using the mails to initiate correspondence in furtherance of "any scheme or artifice to defraud." The sponsor of the recodification stated, in apparent reference to the antifraud provision, that measures were needed "to prevent the frauds which are mostly gotten up in the large cities . . . by thieves, forgers, and rapscallions generally, for the purpose of deceiving and fleecing the innocent people in the country."[5] Insofar as the sparse legislative history reveals anything, it indicates that the original impetus behind the mail fraud statute was to protect the people from schemes to deprive them of their money or property.

*Durland* v. *United States*, 161 U. S. 306 (1896), the first case in which this Court construed the meaning of the phrase "any scheme or artifice to defraud," held that the phrase is to be interpreted broadly insofar as property rights are concerned, but did not indicate that the statute had a more extensive reach. The Court rejected the argument that "the statute reaches only such cases as, at common law, would

---

[5] Cong. Globe, 41st Cong., 3d Sess., 35 (1870) (remarks of Rep. Farnsworth). These remarks were made during the debate on H. R. 2295, the recodification legislation introduced during the 41st Congress. Representative Farnsworth proceeded to describe a scheme whereby the mail was used to solicit the purchase by greedy and unwary persons of counterfeit bills, which were never delivered.

The recodification bill was not passed by the 41st Congress, but was reintroduced and passed by the 42d Congress with the antifraud section intact. Act of June 8, 1872, ch. 335, §§ 149 and 301, 17 Stat. 302 and 323.

come within the definition of 'false pretences,' in order to make out which there must be a misrepresentation as to some existing fact and not a mere promise as to the future." *Id.*, at 312. Instead, it construed the statute to "includ[e] everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future." *Id.*, at 313. Accordingly, the defendant's use of the mails to sell bonds which he did not intend to honor was within the statute. The Court explained that "[i]t was with the purpose of protecting the public against all such intentional efforts to despoil, and to prevent the post office from being used to carry them into effect, that this statute was passed . . . ." *Id.*, at 314.

Congress codified the holding of *Durland* in 1909, and in doing so gave further indication that the statute's purpose is protecting property rights.[6] The amendment added the words "or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" after the original phrase "any scheme or artifice to defraud." Act of Mar. 4, 1909, ch. 321, § 215, 35 Stat. 1130.[7] The new

---

[6] Prior to *Durland* Congress had amended the statute to add language expressly reaching schemes of the period, many of the same nature as those mentioned by Representative Farnsworth in 1870, see n. 5, *supra*, dealing or pretending to deal in counterfeit currency under such names as "green coin" or "green cigars." Act of Mar. 2, 1889, ch. 393, § 1, 25 Stat. 873. The addition of this language appears to have been nothing more than a reconfirmation of the statute's original purpose in the face of some disagreement among the lower federal courts as to whether the statute should be broadly or narrowly read. See Rakoff, The Federal Mail Fraud Statute, 18 Duquesne L. Rev. 771, 790–799, 808–809 (1980). Some of the language added in 1889 was removed in 1948 in an amendment (Act of June 25, 1948, ch. 645, § 1341, 62 Stat. 763) designed to remove surplusage without changing the meaning of the statute. See H. R. Rep. No. 304, 80th Cong., 1st Sess., A100 (1947). Post-1948 amendments to the statute have been technical in nature. The last substantive amendment of the statute, then, was the codification of the holding of *Durland*, and other changes not relevant here, in 1909.

[7] The new language was suggested in the Report of the Commission to Revise and Codify the Criminal and Penal Laws of the United States,

language is based on the statement in *Durland* that the statute reaches "everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future." 161 U. S., at 313. However, instead of the phrase "everything designed to defraud" Congress used the words "[any scheme or artifice] for obtaining money or property."

After 1909, therefore, the mail fraud statute criminalized schemes or artifices "to defraud" or "for obtaining money or property by means of false or fraudulent pretenses, representation, or promises . . . ." Because the two phrases identifying the proscribed schemes appear in the disjunctive, it is arguable that they are to be construed independently and that the money-or-property requirement of the latter phrase does not limit schemes to defraud to those aimed at causing deprivation of money or property. This is the approach that has been taken by each of the Courts of Appeals that has addressed the issue: schemes to defraud include those designed to deprive individuals, the people, or the government of intangible rights, such as the right to have public officials perform their duties honestly. See, *e. g., United States* v. *Clapps,* 732 F. 2d 1148, 1152 (CA3 1984); *United States* v. *States,* 488 F. 2d 761, 764 (CA8 1973).

As the Court long ago stated, however, the words "to defraud" commonly refer "to wronging one in his property rights by dishonest methods or schemes," and "usually signify the deprivation of something of value by trick, deceit, chicane or overreaching." *Hammerschmidt* v. *United States,* 265 U. S. 182, 188 (1924).[8] The codification of the holding in *Durland*

---

which cited *Durland* in the margin of its Report. See S. Doc. No. 68, 57th Cong., 1st Sess., pt. 2, 63, 64 (1901). The sponsor of the 1909 legislation did not address the significance of the new language, stating that it was self-explanatory. 42 Cong. Rec. 1026 (1908) (remarks of Sen. Heyburn).

[8] *Hammerschmidt* concerned the scope of the predecessor of 18 U. S. C. § 371, which makes criminal any conspiracy "to defraud the United States, or any agency thereof in any manner or for any purpose." *Hammer-*

in 1909 does not indicate that Congress was departing from this common understanding. As we see it, adding the second phrase simply made it unmistakable that the statute reached false promises and misrepresentations as to the future as well as other frauds involving money or property.

We believe that Congress' intent in passing the mail fraud statute was to prevent the use of the mails in furtherance of such schemes. The Court has often stated that when there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Con-

---

*schmidt* indicates, in regard to that statute, that while "[t]o conspire to defraud the United States means primarily to cheat the Government out of property or money, . . . it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest." 265 U. S., at 188. Other cases have held that § 371 reaches conspiracies other than those directed at property interests. See, *e. g., Haas* v. *Henkel,* 216 U. S. 462, 480 (1910) (predecessor of § 371 reaches conspiracy to defraud the Government by bribing a Government official to make an advance disclosure of a cotton crop report); *Glasser* v. *United States,* 315 U. S. 60 (1942) (predecessor of § 371 reaches conspiracy to defraud the United States by bribing a United States attorney). However, we believe that this broad construction of § 371 is based on a consideration not applicable to the mail fraud statute.

In *Curley* v. *United States,* 130 F. 1 (CA1 1904), cited with approval in *Haas* v. *Henkel, supra,* the court stated: "Quite likely the word 'defraud,' as ordinarily used in the common law, and as used in English statutes and in the statutes of our states, enacted with the object of protecting property and property rights of communities and individuals, as well as of municipal governments, which exist largely for the purpose of administering local financial affairs, has reference to frauds relating to money and property." 130 F., at 6–7. The court concluded, however, that "[a] statute which . . . has for its object the protection of the individual property rights of the members of the civic body, is one thing; a statute which has for its object the protection and welfare of the government alone, which exists for the purpose of administering itself in the interests of the public, [is] quite another." *Id.,* at 7. Section 371 is a statute aimed at protecting the Federal Government alone; however, the mail fraud statute, as we have indicated, had its origin in the desire to protect individual property rights, and any benefit which the Government derives from the statute must be limited to the Government's interests as property holder.

gress has spoken in clear and definite language. *United States* v. *Bass*, 404 U. S. 336, 347 (1971); *United States* v. *Universal C. I. T. Credit Corp.*, 344 U. S. 218, 221–222 (1952). See also *Rewis* v. *United States*, 401 U. S. 808, 812 (1971). As the Court said in a mail fraud case years ago: "There are no constructive offenses; and before one can be punished, it must be shown that his case is plainly within the statute." *Fasulo* v. *United States*, 272 U. S. 620, 629 (1926). Rather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials, we read § 1341 as limited in scope to the protection of property rights. If Congress desires to go further, it must speak more clearly than it has.

For purposes of this action, we assume that Hunt, as well as Gray, was a state officer. The issue is thus whether a state officer violates the mail fraud statute if he chooses an insurance agent to provide insurance for the State but specifies that the agent must share its commissions with other named insurance agencies, in one of which the officer has an ownership interest and hence profits when his agency receives part of the commissions. We note that as the action comes to us, there was no charge and the jury was not required to find that the Commonwealth itself was defrauded of any money or property. It was not charged that in the absence of the alleged scheme the Commonwealth would have paid a lower premium or secured better insurance. Hunt and Gray received part of the commissions but those commissions were not the Commonwealth's money. Nor was the jury charged that to convict it must find that the Commonwealth was deprived of control over how its money was spent. Indeed, the premium for insurance would have been paid to some agency, and what Hunt and Gray did was to assert control that the Commonwealth might not otherwise

have made over the commissions paid by the insurance company to its agent.[9]  Although the Government now relies in part on the assertion that petitioners obtained property by means of false representations to Wombwell, Brief'for United States 20–21, n. 17, there was nothing in the jury charge that required such a finding.  We hold, therefore, that the jury instruction on the substantive mail fraud count permitted a conviction for conduct not within the reach of § 1341.

The Government concedes that if petitioners' substantive mail fraud convictions are reversed their conspiracy convictions should also be reversed.  *Id.*, at 36, n. 28.

The judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

---

[9] JUSTICE STEVENS would affirm the convictions even though it was not charged that requiring the Wombwell agency to share commissions violated state law.  We should assume that it did not.  For the same reason we should assume that it was not illegal under state law for Hunt and Gray to own one of the agencies sharing in the commissions and hence to profit from the arrangement, whether or not they disclosed it to others in the state government.  It is worth observing as well that it was not alleged that the mail fraud statute would have been violated had Hunt and Gray reported to state officials the fact of their financial gain.  The violation asserted is the failure to disclose their financial interest, even if state law did not require it, to other persons in the state government whose actions could have been affected by the disclosure.  It was in this way that the indictment charged that the people of Kentucky had been deprived of their right to have the Commonwealth's affairs conducted honestly.

It may well be that Congress could criminalize using the mails to further a state officer's efforts to profit from governmental decisions he is empowered to make or over which he has some supervisory authority, even if there is no state law proscribing his profiteering or even if state law expressly authorized it.  But if state law expressly permitted or did not forbid a state officer such as Gray to have an ownership interest in an insurance agency handling the State's insurance, it would take a much clearer indication than the mail fraud statute evidences to convince us that having and concealing such an interest defrauds the State and is forbidden under federal law.

JUSTICE STEVENS, with whom JUSTICE O'CONNOR joins as to Parts I, II, and III, dissenting.

Congress has broadly prohibited the use of the United States mails to carry out "any scheme or artifice to defraud." 18 U. S. C. § 1341. The question presented is whether that prohibition is restricted to fraudulent schemes to deprive others of money or property, or whether it also includes fraudulent schemes to deprive individuals of other rights to which they are entitled. Specifically, we must decide whether the statute's prohibition embraces a secret agreement by state officials to place the State's workmen's compensation insurance with a particular agency in exchange for that company's agreement to share a major portion of its commissions with a list of agents provided by the officials, including sham agencies under the control of the officials themselves.

The same question of statutory construction has arisen in a variety of contexts over the past few decades. In the public sector, judges, State Governors, chairmen of state political parties, state cabinet officers, city aldermen, Congressmen and many other state and federal officials have been convicted of defrauding citizens of their right to the honest services of their governmental officials.[1] In most of these cases,

---

[1] See, e. g., United States v. Holzer, 816 F. 2d 304 (CA7 1987) (county judge); United States v. Silvano, 812 F. 2d 754 (CA1 1987) (city budget director); United States v. Barber, 668 F. 2d 778 (CA4) (State Alcoholic Beverage Control Commissioner), cert. denied, 459 U. S. 829 (1982); United States v. Margiotta, 688 F. 2d 108 (CA2 1982) (party leader), cert. denied, 461 U. S. 913 (1983); United States v. Diggs, 198 U. S. App. D. C. 255, 613 F. 2d 988 (1979) (Congressman), cert. denied, 446 U. S. 982 (1980); United States v. Mandel, 591 F. 2d 1347 (CA4 1979) (Governor of Maryland), cert. denied, 445 U. S. 961 (1980); United States v. Brown, 540 F. 2d 364 (CA8 1976) (city building commissioner); United States v. Bush, 522 F. 2d 641 (CA7 1975) (city Director of Public Relations), cert. denied, 424 U. S. 977 (1976); United States v. Keane, 522 F. 2d 534 (CA7 1975) (city alderman), cert. denied, 424 U. S. 976 (1976); United States v. Staszcuk, 502 F. 2d 875 (CA7 1974) (city alderman), cert. denied, 423 U. S. 837 (1975); United States v. Isaacs, 493 F. 2d 1124 (CA7) (ex-Governor of Illinois and ex-Director of Illinois Department of Revenue), cert. denied, 417

the officials have secretly made governmental decisions with the objective of benefiting themselves or promoting their own interests, instead of fulfilling their legal commitment to provide the citizens of the State or local government with their loyal service and honest government. Similarly, many elected officials and their campaign workers have been convicted of mail fraud when they have used the mails to falsify votes, thus defrauding the citizenry of its right to an honest election.[2] In the private sector, purchasing agents, brokers, union leaders, and others with clear fiduciary duties to their employers or unions have been found guilty of defrauding their employers or unions by accepting kickbacks or selling confidential information.[3] In other cases, defendants

U. S. 976 (1974); *United States* v. *Classic,* 35 F. Supp. 457 (ED La. 1940) (election commissioner).

Some private defendants have also been convicted of devising schemes through which public servants defraud the public. See, *e. g., United States* v. *Lovett,* 811 F. 2d 979 (CA7 1987) (bribing mayor); *United States* v. *Alexander,* 741 F. 2d 962 (CA7 1984) (bribing judge), overruled on other grounds in *United States* v. *Ginsburg,* 773 F. 2d 798, 802 (CA7 1985) (en banc); *United States* v. *Rauhoff,* 525 F. 2d 1170 (CA7 1975) (bribing State Secretary of State); *United States* v. *Faser,* 303 F. Supp. 380 (ED La. 1969) (scheme to bribe state officials).

In *Shushan* v. *United States,* 117 F. 2d 110 (CA5), cert. denied, 313 U. S. 574 (1941), the Fifth Circuit upheld the mail fraud prosecution of a member of a Louisiana parish levy board for receiving kickbacks from the underwriters of a plan to refund outstanding bonds of the levy district. Explaining why it rejected the argument that no actual fraud had occurred because the refunding operation had actually been profitable to the levy board, the court stated:

"No trustee has more sacred duties than a public official and any scheme to obtain an advantage by corrupting such an one must in the federal law be considered a scheme to defraud." 117 F. 2d, at 115.

[2] See, *e. g., United States* v. *Girdner,* 754 F. 2d 877 (CA10 1985) (candidate for state legislature); *United States* v. *Odom,* 736 F. 2d 104, 116, n. 13 (CA4 1984) (sheriff); *United States* v. *Clapps,* 732 F. 2d 1148, 1153 (CA3) (party chairman), cert. denied, 469 U. S. 1085 (1984); *United States* v. *States,* 488 F. 2d 761 (CA8 1973) (candidates for city office), cert. denied, 417 U. S. 909 (1974).

[3] See, *e. g., United States* v. *Price,* 788 F. 2d 234 (CA4 1986), cert. pending *sub nom. McMahan* v. *United States,* No. 86–632; *United States*

have been found guilty of using the mails to defraud individuals of their rights to privacy and other nonmonetary rights.[4] All of these cases have something in common—they involved what the Court now refers to as "intangible rights." They also share something else in common. The many federal courts that have confronted the question whether these sorts of schemes constitute a "scheme or artifice to defraud" have uniformly and consistently read the statute in the same, sensible way. They have realized that nothing in the words "any scheme or artifice to defraud," or in the purpose of the statute, justifies limiting its application to schemes intended to deprive victims of money or property.

I

The mail fraud statute sets forth three separate prohibitions. It prohibits the use of the United States mails for the purpose of executing

"[1] *any* scheme or artifice to defraud, [2] *or* for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, [3] *or* to sell, dispose of, loan, exchange, alter, give away, distribute,

v. *Boffa,* 688 F. 2d 919, 930–931 (CA3 1982); *United States* v. *Curry,* 681 F. 2d 406 (CA5 1982) (chairman of political action committee); *United States* v. *Bronston,* 658 F. 2d 920 (CA2 1981) (attorney), cert. denied, 456 U. S. 915 (1982); *United States* v. *Von Barta,* 635 F. 2d 999 (CA2 1980) (securities trader), cert. denied, 450 U. S. 998 (1981); *United States* v. *Bohonus,* 628 F. 2d 1167 (CA9) (insurance manager), cert. denied, 447 U. S. 928 (1980); *United States* v. *Bryza,* 522 F. 2d 414 (CA7 1975) (purchasing agent), cert. denied, 426 U. S. 912 (1976); *United States* v. *George,* 477 F. 2d 508 (CA7) (purchasing agent), cert. denied, 414 U. S. 827 (1973); *United States* v. *Procter & Gamble Co.,* 47 F. Supp. 676 (Mass. 1942) (attempt to bribe competitor's employee).

[4] See, *e. g., United States* v. *Condolon,* 600 F. 2d 7 (CA4 1979) (wire fraud conviction related to bogus talent agency designed to seduce women); *United States* v. *Louderman,* 576 F. 2d 1383 (CA9) (scheme to fraudulently obtain confidential personal information), cert. denied, 439 U. S. 896 (1978); see also *United States* v. *Castor,* 558 F. 2d 379, 383 (CA7 1977) (fraudulent information on application for liquor license), cert. denied, 434 U. S. 1010 (1978).

supply, or furnish or procure for unlawful use any coun-
terfeit or spurious coin, obligation, security, or other
article, or anything represented to be or intimated or
held out to be such counterfeit or spurious article . . . ."
18 U. S. C. § 1341 (emphasis and brackets added).

As the language makes clear, each of these restrictions
is independent. One can violate the second clause—obtain-
ing money or property by false pretenses—even though one
does not violate the third clause—counterfeiting. Similarly,
one can violate the first clause—devising a scheme or artifice
to defraud—without violating the counterfeiting provision.
Until today it was also obvious that one could violate the
first clause by devising a scheme or artifice to defraud, even
though one did not violate the second clause by seeking to ob-
tain money or property from his victim through false pre-
tenses. Cf. *Streep* v. *United States*, 160 U. S. 128, 132–133
(1895). Every court to consider the matter had so held.[5]
Yet, today, the Court, for all practical purposes, rejects this
longstanding construction of the statute by imposing a re-
quirement that a scheme or artifice to defraud does not vio-
late the statute unless its purpose is to defraud someone of
money or property. I am at a loss to understand the source
or justification for this holding. Certainly no canon of statu-
tory construction requires us to ignore the plain language of
the provision.

In considering the scope of the mail fraud statute it is es-
sential to remember Congress' purpose in enacting it. Con-
gress sought to protect the integrity of the United States
mails by not allowing them to be used as "instruments of
crime." *United States* v. *Brewer*, 528 F. 2d 492, 498 (CA4
1975). See *Durland* v. *United States*, 161 U. S. 306, 314

[5] See, *e. g.*, *Clapps, supra*, at 1152; *States, supra*, at 764; *United States*
v. *Frankel*, 721 F. 2d 917, 920 (CA3 1983); *United States* v. *Scott*, 701 F. 2d
1340, 1343–1344 (CA11), cert. denied, 464 U. S. 856 (1983); *Margiotta,
supra*, at 121; *United States* v. *Halbert*, 640 F. 2d 1000, 1007 (CA9 1981);
*United States* v. *Classic*, 35 F. Supp. 457 (ED La. 1940); see also *ante*,
at 358.

(1896); *Parr* v. *United States*, 363 U. S. 370, 389 (1960); *Gouled* v. *United States*, 273 F. 506, 508 (CA2), aff'd, 255 U. S. 298 (1921). "The focus of the statute is upon the misuse of the Postal Service, not the regulation of state affairs, and Congress clearly has the authority to regulate such misuse of the mails. See *Badders* v. *United States*, 240 U. S. 391 . . . (1916)." *United States* v. *States*, 488 F. 2d 761, 767 (CA8 1973), cert. denied, 417 U. S. 909 (1974). Once this purpose is considered, it becomes clear that the construction the Court adopts today is senseless. Can it be that Congress sought to purge the mails of schemes to defraud citizens of money but was willing to tolerate schemes to defraud citizens of their right to an honest government, or to unbiased public officials? Is it at all rational to assume that Congress wanted to ensure that the mails not be used for petty crimes, but did not prohibit election fraud accomplished through mailing fictitious ballots? Given Congress' "broad purpose," I "find it difficult to believe, absent some indication in the statute itself or the legislative history, that Congress would have undercut sharply that purpose by hobbling federal prosecutors in their effort to combat" use of the mails for fraudulent schemes. *McElroy* v. *United States*, 455 U. S. 642, 655 (1982).

The limitation the Court adopts today shows no fidelity to Congress' words or purpose. The Court recognizes that the "money or property" limitation of the second clause may not actually apply to prosecutions under the first clause. See *ante*, at 358. But where else can such a limitation be derived from? A few examples of the types of frauds that have been prosecuted under the "intangible right" theory reveal that these schemes constitute "fraud" in every sense of the word, and that the "intangible right" theory plays an indispensable role in effectuating Congress' goal of preserving the integrity of the Postal Service.

In *States, supra*, two candidates running for the office of Committeeman in St. Louis, Missouri, used the United States mails in their scheme to falsify voter registration affi-

davits in order to carry out an extensive fraudulent write-in scheme. The candidates had their campaign workers fill in the affidavits with fictitious names and addresses, making sure that the mailing addresses were accessible to the campaign. Applications for absentee ballots were filed, and when they arrived through the mail, they were filled in with the candidates' names and mailed back. The candidates and one of their aides were convicted of mail fraud for having devised a scheme to defraud the voters, the residents, and the Board of Election Commissioners. The Court of Appeals affirmed the convictions, rejecting the defendants' arguments that they had not defrauded anyone since they never sought money or property. The court explained that the term "defraud" must be "construed to further the purpose of the statute; namely, to prohibit the misuse of the mails to further fraudulent enterprises." 488 F. 2d, at 764.

In *United States* v. *Rauhoff*, 525 F. 2d 1170 (CA7 1975), the defendant was part of a scheme that used the United States mail to facilitate its paying the Illinois Secretary of State approximately $50,000 a year in return for the Secretary's awarding the State's license plate contract to a certain company. In response to the argument that all parties to the scheme were reaping profits, and that nobody was defrauded, the Court of Appeals explained that the victims of the scheme were the "people of Illinois, who were defrauded of their right to have the business of the office of the Secretary of State conducted free from bribery." *Id.*, at 1175. Although it was not proved that the State or its citizens lost any money, it was and is clear that this was a scheme to defraud under § 1341.

There are scores of other examples of such schemes which, although not depriving anyone of money or property, are clearly schemes to defraud, and are clearly within the scope of Congress' purpose in enacting the mail fraud statute. See nn. 1–5, *supra*. Discussing the peculiar facts of each of them would only confirm the observation that fraud is "as old as falsehood and as versable as human ingenuity." *Weiss* v.

*United States,* 122 F. 2d 675, 681 (CA5), cert. denied, 314 U. S. 687 (1941). But, taken as a whole, these cases prove just how unwise today's judicial amendment of the mail fraud statute is.

## II

The cases discussed above demonstrate that the construction the courts have consistently given the statute is consistent with the common understanding of the term "fraud," and Congress' intent in enacting the statute. It is also consistent with the manner in which the term has been interpreted in an analogous federal statute; the way the term was interpreted at the time of this statute's enactment; and the statute's scant legislative history. There is no reason, therefore, to upset the settled, sensible construction that the federal courts have consistently endorsed.

The term "defraud" is not unique to § 1341. Another federal statute, 18 U. S. C. § 371, uses the identical term in prohibiting conspiracies to "defraud the United States," and the construction we have given to that statute should be virtually dispositive here. In *Haas* v. *Henkel,* 216 U. S. 462 (1910), the Court, dealing with the predecessor to § 371, rejected the argument that there could be no conspiracy to defraud in the absence of contemplated monetary or property loss. "The statute is broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government." *Id.,* at 479. Again, in *Hammerschmidt* v. *United States,* 265 U. S. 182 (1924), the Court described the scope of the statute as prohibiting not only conspiracies to "cheat the Government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest." *Id.,* at 188.[6] It is thus clear that a

---

[6] "To conspire to defraud the United States means primarily to cheat the Government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest. It is not necessary

conspiracy to defraud the United States does not require any evidence that the Government has suffered any property or pecuniary loss. See also *United States* v. *Barnow*, 239 U. S. 74, 79 (1915).

There is no basis for concluding that the term "defraud" means something different in § 1341 (first enacted in 1872) than what it means in § 371 (first enacted in 1867). Although § 371 includes the words "in any manner or for any purpose," those words only modify the underlying act—fraud, and if that term does not include nonproperty interests then our longstanding interpretation of § 371 is unjustified. In any event, § 1341 itself includes the expansive phrase "any scheme or artifice to defraud."

The Court nonetheless suggests that interpreting the two statutes differently can be justified because § 371 applies exclusively to frauds against the United States, while § 1341 benefits private individuals. *Ante*, at 358–359, n. 8. This argument is wide of the mark. The purpose of § 1341 is to protect the integrity of the United States Postal Service, and, as I have explained, it is ludicrous to think that a Congress intent on preserving the integrity of the Postal Service would have used the term "defraud" in a narrow sense so as to allow mailings whose purpose was merely to defraud citizens of rights other than money or property. There is, therefore, no reason to believe that Congress used the term "defraud" in a more limited way in § 1341 than it did in § 371.[7]

---

that the Government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane or the overreaching of those charged with carrying out the governmental intention." *Hammerschmidt* v. *United States*, 265 U. S., at 188.

It is extraordinary that the only support the Court presents for its narrow definition is some language in *Hammerschmidt*, see *ante*, at 358, even though *Hammerschmidt* itself goes on to expressly reject the notion that fraud is limited to interference with monetary or property rights.

[7] The prohibition against employing "any device, scheme, or artifice to defraud" in connection with transactions on a National Securities Exchange similarly does not require proof that specific individuals have suffered tan-

The Court is correct in pointing out that Congress intended to go beyond any common-law meaning of the word "defraud" in enacting § 371. See *ante*, at 358–359, n. 8, citing *United States* v. *Keitel*, 211 U. S. 370, 393 (1908). But we have also rejected the argument that the common-law meaning of the term "defraud" confines the scope of § 1341. See *Durland* v. *United States*, 161 U. S. 306 (1896).

Examination of the way the term "defraud" has long been defined, and was defined at the time of the statute's enactment, makes it clear that Congress' use of the term showed no intent to limit the statute to property loss. Cf. *Saint Francis College* v. *Al-Khazraji*, 481 U. S. 604 (1987) (looking to contemporaneous dictionary definitions in construing the word "race"). For example, Justice Story cites the definition of "fraud" as "applied to every artifice made use of by one person for the purpose of deceiving another," or as "any cunning, deception, or artifice used to circumvent cheat, or deceive another." 1 J. Story, Equity Jurisprudence § 186, pp. 189–190 (1870). Similarly, the law dictionaries of the era broadly defined the type of interests subject to deprivation by fraudulent action. One leading dictionary stated that "[t]o defraud is to withhold from another that which is justly due to him, or to deprive him of a right by deception or artifice." 1 Bouvier's Law Dictionary 530 (1897). Another dictionary defined "defraud" as "[t]o cheat; to deceive; to deprive of a right by an act of fraud . . . to withhold from another what is justly due him, or to deprive him of a right, by deception or artifice." W. Anderson, A Dictionary of

gible losses. See *SEC* v. *Texas Gulf Sulphur Co.*, 401 F. 2d 833, 848 (CA2 1968), cert. denied *sub nom. Coates* v. *SEC*, 394 U. S. 976 (1969). By its terms, that language is broad enough to "reach *any* person engaged in *any* fraudulent scheme." *Chiarella* v. *United States*, 445 U. S. 222, 240 (1980) (Burger, C. J., dissenting). See also *Myzel* v. *Fields*, 386 F. 2d 718, 739 (CA8 1967), cert. denied, 390 U. S. 951 (1968); *A. T. Brod & Co.* v. *Perlow*, 375 F. 2d 393, 397 (CA2 1967).

Law 474 (1893). See also 1 Burrill's Law Dictionary 658–659 (1859).[8]

It is, in fact, apparent that the common law criminalized frauds beyond those involving "tangible rights." For example, in a case remarkably similar to the one before us, a public official was convicted for depriving the government of his honest services. See *Trial of Valentine Jones*, 31 How. St. Tr. 251 (1809). The case has been abstracted as follows:

> "A, a commissary-general of stores in the West Indies, makes contracts with B to supply stores, on the condition that B should divide the profits with A. A commits a misdemeanor." J. Stephen, Digest of The Criminal Law, Art. 121, p. 85 (3d ed. 1883).

By the same token, the crime of fraud has often included deceptive seduction, although that crime often includes no property or monetary loss. See *State* v. *Parker*, 114 Wash. 428, 195 P. 229 (1921); cf. *United States* v. *Condolon*, 600 F. 2d 7 (CA4 1979) (fraudulent scheme to seduce women supported wire fraud conviction). Of course, even if the term was not that expansively defined at common law, we have held that Congress went beyond the common-law definitions in enacting this statute. *Durland*, 161 U. S., at 313–314.

In a recent decision upholding the mail fraud conviction of an Illinois judge, despite the absence of proof that anyone suffered loss of tangible property, the Court of Appeals for the Seventh Circuit reaffirmed the broad meaning of the word "defraud." *United States* v. *Holzer*, 816 F. 2d 304 (1987). Writing for the court, Judge Posner explained:

> "Fraud in its elementary common law sense of deceit—and this is one of the meanings that fraud bears

---

[8] Although there are surely cases and commentaries to be found which describe "fraud" in a more limited manner, none have been brought to our attention that reject the broader interpretations cited here. There is, of course, no doubt that the term "defraud" includes money and property interests, and the cases referring to such interests do not conflict with my understanding of the statute.

in the statute, see *United States* v. *Dial*, 757 F. 2d 163, 168 (7th Cir. 1985)—includes the deliberate concealment of material information in a setting of fiduciary obligation. A public official is a fiduciary toward the public, including, in the case of a judge, the litigants who appear before him, and if he deliberately conceals material information from them he is guilty of fraud. When a judge is busily soliciting loans from counsel to one party, and not telling the opposing counsel (let alone the public), he is concealing material information in violation of his fiduciary obligations.

.        .        .        .        .

"Second, the systematic and long-continued receipt of bribes by a public official, coupled with active efforts to conceal the bribe-taking from the public and the authorities . . . is fraud (again in its elementary sense of deceit, and quite possibly in other senses as well), even if it is the public rather than counsel that is being kept in the dark. It is irrelevant that, so far as appears, Holzer never ruled differently in a case because of a lawyer's willingness or unwillingness to make him a loan, so that his conduct caused no demonstrable loss either to a litigant or to the public at large. See, *e. g.*, *United States* v. *Keane*, 522 F. 2d 534, 541, 546 (7th Cir. 1975); *United States* v. *Lovett*, 811 F. 2d 979, 985 (7th Cir. 1987); *United States* v. *Manton*, 107 F. 2d 834, 846 (2d Cir. 1939). How can anyone prove how a judge would have ruled if he had not been bribed?" *Id.*, at 307–308.

The general definition of the term "defraud" does not support, much less compel, today's decision.

Even if there were historical evidence of a limited definition of "fraud," the Court's holding would reflect a strange interpretation of legislation enacted by the Congress in the 19th century. Statutes like the Sherman Act, the civil rights legislation, and the mail fraud statute were written in broad general language on the understanding that the courts would

have wide latitude in construing them to achieve the remedial purposes that Congress had identified. The wide open spaces in statutes such as these are most appropriately interpreted as implicit delegations of authority to the courts to fill in the gaps in the common-law tradition of case-by-case adjudication. The notion that the meaning of the words "any scheme or artifice to defraud" was frozen by a special conception of the term recognized by Congress in 1872 is manifestly untenable. As Judge Posner put it:

"The argument depends on the view that the meaning of fraud in the mail-fraud statute was frozen by the conception of fraud held by the framers of the statute when it was first passed back in the nineteenth century. This seems to us the opposite and equally untenable extreme from arguing that fraud is whatever strikes a judge as bad, but in any event the 'intangible rights' concept that the argument attacks is too well established in the courts of appeals for us to disturb." *Holzer*, 816 F. 2d, at 310.

Finally, there is nothing in the legislative history of the mail fraud statute that suggests that Congress intended the word "fraud" to have a narrower meaning in that statute than its common meaning and the meaning that it has in § 371. As originally enacted in 1872, the statute had but one class of prohibition: use of the mails as part of "any scheme or artifice to defraud." Act of June 8, 1872, ch. 335, § 301, 17 Stat. 323. The second clause, which prohibits "any scheme . . . for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," was added in 1909. Act of Mar. 4, 1909, ch. 321, § 215, 35 Stat. 1130. The purpose of the second clause was to codify this Court's holding in *Durland* that the Act prohibits false promises even if they did not qualify as "fraud" at common law. See *Durland*, 161 U. S., at 312–314. There is no evidence to suggest that Congress sought to limit the scope of the original prohibition, and its use of the disjunctive "or" demonstrates that it was adding to, not modifying, the original prohibition. See *Reiter* v.

*Sonotone Corp.*, 442 U. S. 330, 339 (1979); see also *Streep* v. *United States*, 160 U. S., at 132–133.

Reviewing the general history of Congress' reactions to the courts' decisions interpreting the mail fraud statute also supports the reading the lower courts have attributed to § 1341. The general language in the mail fraud statute has repeatedly been construed to cover novel species of fraud, and Congress has repeatedly amended the statute in ways that support a broad interpretation of its basic thrust. That long history is accurately summarized in the following observations:

> "First enacted in 1872, the mail fraud statute, together with its lineal descendant, the wire fraud statute, has been characterized as the 'first line of defense' against virtually every new area of fraud to develop in the United States in the past century. Its applications, too numerous to catalog, cover not only the full range of consumer frauds, stock frauds, land frauds, bank frauds, insurance frauds, and commodity stock frauds, but have extended even to such areas as blackmail, counterfeiting, election fraud, and bribery. In many of these and other areas, where legislatures have sometimes been slow to enact specific prohibitory legislation, the mail fraud statute has frequently represented the sole instrument of justice that could be wielded against the ever-innovative practitioners of deceit.
>
> "During the past century, both Congress and the Supreme Court have repeatedly placed their stamps of approval on expansive use of the mail fraud statute. Indeed, each of the five legislative revisions of the statute has served to enlarge its coverage." Rakoff, The Federal Mail Fraud Statute, 18 Duquesne L. Rev. 772–773 (1980).

### III

To support its crabbed construction of the Act, the Court makes a straightforward but unpersuasive argument. Since there is no explicit, unambiguous evidence that Congress ac-

tually contemplated "intangible rights" when it enacted the mail fraud statute in 1872, the Court explains, any ambiguity in the meaning of the criminal statute should be resolved in favor of lenity. The doctrine of lenity is, of course, sound, for the citizen is entitled to fair notice of what sort of conduct may give rise to punishment. But the Court's reliance on that doctrine in this case is misplaced for several reasons.

To begin with, "although 'criminal statutes are to be construed strictly . . . this does not mean that every criminal statute must be given the narrowest possible meaning in complete disregard of the purpose of the legislature.'" *McElroy* v. *United States*, 455 U. S., at 658, quoting *United States* v. *Bramblett*, 348 U. S. 503, 509–510 (1955). Especially in light of the statutory purpose, I believe that § 1341 unambiguously prohibits all schemes to defraud that use the United States mails—whether or not they involve money or property.

In any event, this asserted ambiguity in the meaning of the word "defraud," if it ever existed, was removed by judicial construction long ago. Even if Chief Justice Taft's opinion for the Court in the *Hammerschmidt* case was not sufficient to make it perfectly clear that a fraud on the public need not deprive it of tangible property, the series of Court of Appeals' opinions applying this very statute to schemes to defraud a State and its citizens of their intangible right to honest and faithful government, notwithstanding the absence of evidence of tangible loss, removed any relevant ambiguity in this statute. Surely these petitioners knew that it would be unlawful to place Kentucky's insurance coverage with an agent who would secretly make hundreds of thousands of dollars available for the private use of petitioners, their relatives, and their paramours. This is, indeed, a strange application of the doctrine of lenity.[9]

---

[9] When considering how much weight to accord to the doctrine of lenity, it is appropriate to identify the class of litigants that will benefit from the Court's ruling today. They are not uneducated, or even average, citizens. They are the most sophisticated practitioners of the art of government

I recognize that there may have been some overly expansive applications of § 1341 in the past. With no guidance from this Court, the Courts of Appeals have struggled to define just when conduct which is clearly unethical is also criminal. In some instances, however, such as voting fraud cases, the criminality of the scheme and the fraudulent use of the mails could not be clearer. It is sometimes difficult to define when there has been a scheme to defraud someone of intangible rights. But it is also sometimes difficult to decide when a tangible loss was caused by fraud. The fact that the exercise of judgment is sometimes difficult is no excuse for rejecting an entire doctrine that is both sound and faithful to the intent of Congress.

## IV

Perhaps the most distressing aspect of the Court's action today is its casual—almost summary—rejection of the accumulated wisdom of the many distinguished federal judges who have thoughtfully considered and correctly answered the question these cases present. The quality of this Court's work is most suspect when it stands alone, or virtually so, against a tide of well-considered opinions issued by state or federal courts. In these cases I am convinced that those judges correctly understood the intent of the Congress that enacted this statute. Even if I were not so persuaded, I could not join a rejection of such a longstanding, consistent interpretation of a federal statute. See *Commissioner of Internal Revenue* v. *Fink*, 483 U. S. 89, 101 (1987) (STEVENS, J., dissenting); *Citicorp Industrial Credit, Inc.* v.

---

among us. There is an element of fiction in the presumption that every citizen is charged with a responsibility to know what the law is. But the array of government executives, judges, and legislators who have been accused, and convicted, of mail fraud under the well-settled construction of the statute that the Court renounces today are people who unquestionably knew that their conduct was unlawful. Cf. *Nash* v. *United States*, 229 U. S. 373, 377 (1913).

*Brock,* 483 U. S. 27, 40 (1987) (STEVENS, J., dissenting); *Runyon* v. *McCrary,* 427 U. S. 160, 189 (1976) (STEVENS, J., concurring).

In the long run, it is not clear how grave the ramifications of today's decision will be. Congress can, of course, negate it by amending the statute. Even without congressional action, prosecutions of corrupt officials who use the mails to further their schemes may continue since it will frequently be possible to prove some loss of money or property.[10] But many other types of fraudulent use of the mail will now be immune from prosecution. The possibilities that the decision's impact will be mitigated do not moderate my conviction that the Court has made a serious mistake. Nor do they erase my lingering questions about why a Court that has not been particularly receptive to the rights of criminal defendants in recent years has acted so dramatically to protect the elite class of powerful individuals who will benefit from this decision.

I respectfully dissent.

---

[10] When a person is being paid a salary for his loyal services, any breach of that loyalty would appear to carry with it some loss of money to the employer—who is not getting what he paid for. Additionally, "[i]f an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is subject to a liability to deliver it, its value, or its proceeds, to the principal." Restatement (Second) of Agency § 403 (1958). This duty may fulfill the Court's "money or property" requirement in most kickback schemes.

Of course, "the fact that a scheme may or may not violate State law does not determine whether it is within the proscriptions of the federal statute." *United States* v. *Edwards,* 458 F. 2d 875, 880 (CA5), cert. denied *sub nom. Huie* v. *United States,* 409 U. S. 891 (1972). See *Margiotta,* 688 F. 2d, at 124; *Mandel,* 591 F. 2d, at 1361; *Brown,* 540 F. 2d, at 374, n. 7; *Bush,* 522 F. 2d, at 646, n. 6. The mail fraud statute is a self-contained provision, which does not rely on any state enactments for its force. Cf. 18 U. S. C. § 1952 (b) (defining "unlawful activity" with reference to state law). The lack of a state statute forbidding the underlying conduct does not immunize a defendant from prosecution when he or she uses the United States mails as part of the scheme.