# United States Court of Appeals
## For the Eighth Circuit

_____

No. 11-3127
_____

Loren George Jennings

*Petitioner - Appellant*

v.

United States of America

*Respondent - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: May 18, 2012
Filed: October 15, 2012

_____

Before LOKEN and BEAM, Circuit Judges, and PERRY[1], District Judge.

_____

PERRY, District Judge.

Loren George Jennings was convicted of two counts of mail fraud and one count of money laundering in 2005. His conviction and sentence were affirmed on direct appeal. *See United States v. Jennings*, 487 F.3d 564 (8th Cir. 2007). After the

_____

[1]The Honorable Catherine D. Perry, Chief Judge, United States District Court for the Eastern District of Missouri.

Supreme Court issued its opinion in *Skilling v. United States*, 130 S. Ct. 2896 (2010), Jennings filed a motion to vacate his conviction under 28 U.S.C. § 2255, which the district court[2] denied as procedurally barred. Jennings appeals, arguing that his claim was presented in his direct appeal and that, in any event, he is actually innocent of the crime for which he was convicted. We affirm.

## I.    BACKGROUND

The complete facts of this case are discussed in the opinion affirming Jennings's conviction and sentence on direct appeal. *See Jennings*, 487 F.3d 564. A brief summary of the facts relevant here will suffice.

Jennings was a Minnesota state representative from 1984 through 2002. He served on the House Regulated Industries Committee, including serving at times as chairman or the ranking minority member. He also had a partnership interest in two companies: M & M Sanitation (M & M) and C & J Properties (C & J). One of Jennings's other business associates, John James, was a banker at Town & Country Bank in Almelund, Minnesota. The bank had previously made a loan to a company called Poletech, which had been working to develop "hollow veneer" utility poles. By the time of Jennings's involvement, the Poletech loan had become a problem loan. Banker James formed a company called Northern Pole to purchase Poletech's assets, and he asked Jennings to make a "bridge loan" to Northern Pole. To do this, Jennings caused M & M to borrow $315,000 from Town & Country Bank in April 1997; M & M then lent those funds to Northern Pole. Jennings personally guaranteed the loan in order to get his partners' consent. Northern Pole gave M & M a promissory note, which was extended several times but never paid down. This loan was not reported in M & M's financial statements. In April 1998, C & J borrowed an additional

[2]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

$355,000 from Town & Country Bank and made a loan in that amount to Northern Pole, again personally guaranteed by Jennings. Jennings thus had personally guaranteed a total of $670,000 in loans from M & M and C & J to Northern Pole.

In the summer of 1998, Northern Pole suffered a fire at its work site and changed its business enterprise from developing hollow poles to researching new recycling methods for the utility poles currently in use. In order to get funding for the struggling company, Jennings used his political position to sponsor and pass a bill in the Minnesota legislature amending the Conservation Improvement Program (CIP) in a way that would benefit Northern Pole. The CIP used surcharges from utility customers to fund conservation projects. The amendment made research projects such as Northern Pole's eligible for CIP funds.

After the CIP amendment was passed, Jennings approached two Minnesota utility companies, NSP and Minnesota Power, to see if they would provide CIP funds to Northern Pole. Jennings told the utility companies that he was working on behalf of a constituent and that he had no other interest in Northern Pole. The utilities decided to award money to Northern Pole; testimony showed that the decision was made primarily because of Jennings's political power and influence. When each CIP payment was awarded, Northern Pole paid part of the money directly back to M & M and C & J to repay the loans that Jennings had personally guaranteed. Because CIP payments are public funds, they must be approved by the Minnesota Department of Commerce. In May 2000, Jennings, James, and the acting president of Northern Pole fabricated a report for the Department of Commerce, accounting for the use of its CIP funds. In reality, the only work done by Northern Pole for the utility companies was preparation of a three-ring binder of research, which was merely a summary of research already done in the field. It had been compiled by the acting president's daughter-in-law. By 2002, the CIP funds that had been awarded to Northern Pole totaled $650,000, of which $284,398 was used to make payments directly to M & M and C & J.

At trial, Jennings was convicted of two counts of mail fraud (using an honest-services fraud theory) and one count of money laundering. He was sentenced to 48 months' imprisonment and ordered to pay restitution in the amount of $284,398, the amount of money from the scheme that personally benefitted him, and to forfeit the same amount to the government. His conviction was affirmed on appeal. *Jennings*, 487 F.3d 564. After the United States Supreme Court decided *Skilling*, Jennings filed a motion under 28 U.S.C. § 2255. Jennings argued in his § 2255 motion that his honest-services mail fraud conviction was not valid after *Skilling*, because the evidence at his trial did not show that bribes or kickbacks were involved. The district court denied the § 2255 motion, holding that the claim was procedurally barred because Jennings did not raise it on direct appeal. The judge granted a certificate of appealability on the issue of whether Jennings's conviction must be set aside based on *Skilling*.

## II.   DISCUSSION

This court reviews a district court's denial of a § 2255 motion *de novo*. *Hodge v. United States*, 602 F.3d 935, 937 (8th Cir. 2010). "Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal." *Bousley v. United States*, 523 U.S. 614, 621 (1998) (internal quotation marks and citations omitted). Thus, a petitioner may not raise an issue before the district court for the first time in a § 2255 motion if the issue was not presented on direct appeal from the conviction. *See Matthews v. United States*, 114 F.3d 112, 113 (8th Cir. 1997). "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'" *Bousley*, 523 U.S. at 622 (internal citations omitted).

As relevant to this count of conviction, Jennings raised the following arguments on his direct appeal: (1) the evidence was insufficient to prove that he had a duty to

disclose his interest in Northern Pole; (2) the jury instructions were erroneous because the jury should have been instructed that the government was required to prove his violation of a state law; (3) the jury instructions were erroneous because the jury should have been instructed that the government was required to prove gain or loss in an honest-services mail fraud scheme; (4) the district court erred in two evidentiary rulings; (5) the district court erred in the amount of its forfeiture order because forfeiture was only authorized for the money laundering offense, not the mail fraud offenses; and (6) the district court erred by applying the sentencing guideline for honest-services fraud rather than the guideline for conflict of interest or receipt of unauthorized compensation. *See Jennings*, 487 F.3d 564.

In *Skilling,* the Supreme Court held that honest-services fraud under 18 U.S.C. § 1346 is limited to schemes involving bribery or kickbacks. 130 S.Ct. at 2931. Skilling was a former Enron executive charged with wire fraud for depriving Enron and its shareholders of the intangible right of his honest services. *Id.* at 2907-08. Skilling argued on appeal that 18 U.S.C. § 1346 is unconstitutionally vague. *Id.* at 2926. The Supreme Court agreed that the statute may be unconstitutionally vague if not limited in some way, but held that it passed constitutional muster when confined to cover only schemes involving bribery or kickbacks. *Id.* at 2931. The Court concluded that Skilling's conduct did not fall within the statute because his scheme did not involve bribery or kickbacks. *Id.* at 2934.

The main argument in Jennings's § 2255 motion was that his conduct was not unlawful under *Skilling*'s new interpretation of honest-services mail fraud because the evidence supporting his conviction did not involve bribes or kickbacks. The district court held that Jennings had procedurally defaulted this argument by failing to raise it on direct appeal. Although the district court recognized that Jennings's argument was based on *Skilling*, which was decided after his direct appeal had been denied, Jennings could have at any time raised the same legal issue that had been raised in

*Skilling*: that the honest-services fraud statute was unconstitutionally vague and should be limited to cases involving bribes or kickbacks.

Jennings now argues that he did raise the same argument presented in *Skilling* on his direct appeal; he thus argues that this claim is not procedurally barred. In his direct appeal, Jennings argued generally that 28 U.S.C. § 1346 did not encompass his conduct. Specifically, he argued that it did not reach his conduct because he did not violate state disclosure laws or any other duty to disclose his interest in Northern Pole. Thus, Jennings claims that he made the same basic argument as that presented in *Skilling*: that the statute did not criminalize his conduct.

The government responds that the argument made in *Skilling* was not as broad as Jennings proposes. In *Skilling*, the appellant argued that 28 U.S.C. § 1346 did not cover his conduct because the statute was unconstitutionally vague. Jennings's specific argument was that the statute did not cover his conduct because the government did not prove that he violated a state law. Thus, according to the government, Jennings procedurally defaulted the argument he now raises on appeal.

Jennings's arguments on appeal challenged the jury instructions concerning whether the government had to prove the source of his duty to disclose the conflict of interest, or whether the scheme must involve proof of a "gain" or "loss." Jennings's briefs never discussed the constitutionality of 18 U.S.C. § 1346 generally, nor did they discuss any requirement that the statute must be limited to bribery or kickbacks to pass constitutional muster. Although he now asserts that he made a vagueness challenge, each allegation of vagueness was raised specifically in relation to his arguments regarding disclosure of a conflict of interest or proof of a gain or loss.[3] A claim that

_____

[3]Jennings only mentioned the statute's vagueness in his brief on direct appeal in three specific contexts, each of which is distinguishable from the vagueness challenge made in *Skilling*. First, Jennings argued that in rejecting his proposed jury instruction regarding the duty to disclose a conflict of interest, "the Court improperly

the statute is unconstitutionally vague for entirely different reasons than those proposed in *Skilling* is not sufficient to preserve Jennings's current claim. Therefore, we hold that because Jennings did not raise this issue on direct appeal, he has procedurally defaulted the claim.

In order to obtain collateral review on a procedurally defaulted claim, a habeas petitioner must show either that there was cause for his procedural default and actual prejudice, or that he is actually innocent of the crime for which he was convicted. *See Bousley*, 523 U.S. at 622. Jennings does not raise the exception for cause and prejudice, presumably for the reason that, as the district court pointed out, he argues that he did not procedurally default this argument. Therefore, he does not provide any cause for his default.

---

enlarged the scope of honest services fraud. '[P]eople are entitled to clear notice of what the criminal law forbids, and courts must take care not to enlarge the scope of illegality.'" J.A. at 159 (quoting *United States v. Genova*, 333 F.3d 750, 757-58 (7th Cir. 2003)).

Second, in arguing that honest-services fraud for public officials should be limited according to state law, Jennings cited to a case from the Third Circuit Court of Appeals that stated: "Rather than substituting one ambiguous standard for another in holding that an official deprives the public of his honest services only if he misuses office for personal gain, we believe that state law offers a better limiting principle for purposes of determining when an official's failure to disclose a conflict of interest amounts to honest services fraud." J.A. at 159-60 (quoting *United States v. Panarella*, 277 F.3d 678, 692-93 (3d Cir. 2002)).

Finally, as support for his argument that the statute should require proof of a gain or loss, Jennings argued that the court should "exercise[] restraint in assessing the reach of a federal criminal statute . . . out of a concern that 'a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed.'" J.A. at 161 (quoting *United States v. Aguilar*, 515 U.S. 593, 600 (1995) (internal quotation marks and citations omitted)).

Jennings does argue, however, that he is actually innocent of honest-services fraud, as it is now defined by the Supreme Court after *Skilling*. To invoke the actual innocence exception, Jennings must show that in light of all the evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623 (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)). This test refers to whether the petitioner is actually innocent of the offense "as modified" by "intervening decisions modifying the substantive criminal law defining the offense . . . ." *United States v. Morgan*, 230 F.3d 1067, 1070 (8th Cir. 2000).

As modified by the Supreme Court in *Skilling*, honest-services fraud under 28 U.S.C. § 1346 criminalizes only schemes involving bribery or kickbacks. *Skilling*, 130 S. Ct. at 2931. The Court described a "classic kickback scheme" as that employed in *McNally v. United States*, 483 U.S. 350 (1987): "A public official, in exchange for routing Kentucky's insurance business through a middle-man company, arranged for that company to share its commissions with entities in which the official held an interest." *Skilling*, 130 S. Ct. at 2932 (citing *McNally*, 483 U.S. at 352-53).

The government analogizes Jennings's conduct to the facts underlying the scheme in *McNally*. In *McNally*, two petitioners, Charles McNally and James Gray, along with the former chairman of the Commonwealth of Kentucky's Democratic Party, Howard Hunt, were charged with mail fraud for devising a scheme to deprive the public of their "intangible right" to have the affairs of the Commonwealth performed honestly. *McNally*, 483 U.S. at 352. As the party chairman, Hunt was given the power to select the insurance companies from which the Commonwealth would purchase policies. *Id.* Hunt entered into an agreement with the Wombwell Insurance Company in which it would share any commissions in excess of $50,000 with other insurance companies specified by Hunt. *Id.* Gray and Hunt established and controlled Seton Investments, Inc., which McNally also nominally owned and

operated, for the sole purpose of sharing in these commissions. *Id*. at 353. Payments were also made to the Snodgrass Insurance Agency, which gave its commissions directly to McNally. *Id.* The *Skilling* Court clarified that this scheme did not constitute a "mere failure to disclose a conflict of interest; rather, the official conspired with a third party so that both would profit from wealth generated by public contracts." *Skilling*, 130 S.Ct. at 2932 (citing *McNally*, 483 U.S. at 352-53).

The *Skilling* Court thus described McNally's scheme as involving several elements, and those elements are present here. First, *McNally* involved a "public official." *Skilling*, 130 S. Ct. at 2932. In this case, Jennings was a public official as a representative for the state of Minnesota. Second, McNally's scheme involved "routing Kentucky's insurance business through a middle-man company." *Id.* The funds used to purchase the state's insurance policies in *McNally* were public funds, as are the CIP funds at issue in this case. Jennings enabled Northern Pole to receive the public CIP funds by successfully expanding the state legislation regarding these funds to encompass the work done by Northern Pole. He then met with various utility companies to ensure that Northern Pole would receive CIP funding for its projects, with testimony presented that the companies awarded funds to Northern Pole because of Jennings's political power and influence. In this way, he "routed" the public CIP funds from NSP and Minnesota Power to Northern Pole. The final element of McNally's scheme was that the routing was executed in exchange for the middle-man company "shar[ing] its commissions with entities in which the official held an interest." *Id.* Here, Jennings had a financial interest in Northern Pole because he personally guaranteed loans to the company totaling $670,000. When CIP payments were given to Northern Pole, portions of that money were sent directly to M & M and C & J toward repayment of those loans, thereby benefitting Jennings in the amount of $284,398.

The evidence at trial was sufficient to demonstrate a kickback scheme as contemplated by *Skilling*, thereby supporting a conviction under 28 U.S.C. § 1346,

even under the more restricted interpretation of that statute. Because we find that Jennings cannot demonstrate that it is more likely than not that no reasonable juror would have convicted him of this offense under the statute's narrower interpretation, Jennings does not meet the exception for actual innocence to excuse his procedural default.

## III. CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

_____