**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Chester FOLAK, Defendant–Appellant.**

**No. 88–1038.**

United States Court of Appeals,
Seventh Circuit.

Argued June 8, 1988.

Decided Dec. 19, 1988.

Peter O'Maley, Allan A. Ackerman, P.C., Chicago, Ill., for defendant-appellant.

David J. Stetler, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, COFFEY and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

Chester Folak was convicted following a bench trial on stipulated facts of a total of 28 counts of mail fraud, 18 U.S.C. § 1341, and extortion, 18 U.S.C. § 1951, arising out of his activities as a Cook County Sheriff's Deputy. We affirmed Folak's conviction on direct appeal. *United States v. Schmidt*, 760 F.2d 828 (7th Cir.), *cert. denied, Folak v. United States*, 474 U.S. 827, 106 S.Ct. 86, 88 L.Ed.2d 71 (1985). In the meantime, the Supreme Court decided *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), holding that the mail fraud statute does not prohibit schemes to defraud the people of their "intangible rights," such as the right to an honest and impartial government. Folak contends that, because he was indicted under an intangible rights theory, *McNally* requires us to set aside his conviction. He requested relief in the district court in the form of a motion to set aside his conviction pursuant to 28 U.S.C. § 2255 and a petition for a writ of coram nobis. The district court denied Folak relief, and we affirm.

I

Chester Folak was a Deputy in the Cook County Sheriff's Department assigned the task of enforcing seizure warrants and writs of execution against delinquent taxpayers and judgment debtors. Folak's job was to serve a copy of the seizure warrant or writ of execution on the debtor, make an accurate inventory of the debtor's personal property, collect money owed from the debtor and/or conduct a public auction of the debtor's personal property, and remit all monies collected from the debtor or the auction to the Cook County Sheriff's office for disbursement to the appropriate party. Instead of faithfully discharging those duties pursuant to his oath of office, Folak and his co-defendants devised a scheme to enrich themselves at the expense of judgment creditors, the State of Illinois, and the debtors. Although the scheme took various forms, each instance of mail fraud was actually a variation on the same basic theme. In most scenarios, Folak was assigned to serve a seizure warrant on a business that was delinquent in paying its state taxes. Instead of "seizing" the assets, however, Folak would arrange with the debtor to purchase the assets of his or her own business under a new name, with a portion of the purchase price going to the State, and the remainder going to Folak and his cohorts. No public auction would be held. Folak would then report to the Department of Revenue that the business had been sold at public auction for whatever price he deemed appropriate to turn over to the state, after extracting his own "fee" for services rendered.

Count 2 of the indictment provides one typical example of how the scheme worked. The indictment alleged and the stipulated facts established that Folak was assigned a seizure warrant against Gayle's Car Wash, Inc., for back taxes of $25,049.20 owed the State of Illinois. Folak approached the owner of the car wash and told her that her business would have to be closed and sold pursuant to the warrant, but that she could repurchase the business if she formed a new corporation. The car wash operator told Folak she could raise $8,000 and she obtained a cashier's check in this amount, made payable to the Sheriff of Cook County. In the meantime, she received Articles of Incorporation from the Illinois Secretary of State for Ted and Jimmy's Car Wash, Inc. At Folak's request, the owner then obtained, in place of the cashier's check for $8,000, a different cashier's check in the amount of $6,500 and gave Folak the remainder of the $8,000 ($1,500) in cash. Folak in turn gave the $6,500 check to the Sheriff's Levy Department, along with a false report that the assets of Gayle's Car Wash had been sold at public auction for $6,500 to Ted and Jimmy's Car Wash. Of the remaining $1,500 cash he received from the owner, Folak gave $100 to the Sheriff's office as payment for Sheriff's fees and

commissions. The remaining $1,400 was never submitted to the state.

Count 42 of the indictment illustrates a second common permutation of Folak's fraudulent scheme. Folak was assigned a seizure warrant in the amount of $121,216.91 against the Golden First, Inc. liquor store. Although the estimated value of the store's inventory at the time of the seizure was somewhere between $20,000–$25,000, Folak prepared only a partial listing of the inventory. He and his friends then helped themselves to a large portion of the inventory, never holding a public auction. Instead, Folak falsely reported that the inventory had been sold at public auction for $3,000, listing a fictitious purchaser at a fictitious address. Thus, Folak and his co-defendants obtained liquor worth approximately $20,000.

Most of the transactions making up the mail fraud counts took one of these two basic forms, sometimes involving a combination of both. Other times, Folak would accept payment from the debtor completely in the form of cash, rather than divided into cashier's check/cash amounts, but in every instance Folak turned over to the state less cash than he had received. The amount of cash he and his co-defendants would keep varied from case to case, with $370 representing the low end of the scale and $6,900 representing the high end. The amount and type of inventory they would help themselves to varied from shoes to a rocking chair to $20,000 worth of liquor. On some occasions, Folak accepted money or goods such as free gasoline from a debtor, in return for Folak agreeing to look the other way while the debtor removed all of the business' inventory and assets, leaving nothing for the state to seize toward payment of back taxes. All in all, the government estimated that Folak and his co-defendants had obtained in excess of $35,000, plus substantial goods, merchandise and services.

Based upon these activities, Folak and his two co-defendants were charged with a total of 47 counts of mail fraud and extortion. Count 1 of the indictment outlined the broad parameters of the mail fraud scheme, alleging that Folak and the others had:

> ... devised and intended to devise a scheme to obtain money and property by means of false and fraudulent representations, pretenses, and promises, and to defraud:
> a. The Illinois Department of Revenue of:
> (1) money;
> (2) its right to have seizure warrants and public auctions conducted thereon executed by the Sheriff's Office honestly, fairly, and free from craft, trickery, deceit, corruption, dishonesty, and fraud; and
> (3) its right to have payments on taxes, interest, and penalties owed to the State of Illinois collected and remitted honestly, fairly, and free from craft, trickery, deceit, corruption, dishonesty, and fraud; and
> b. Creditors holding judgments of:
> (1) money;
> (2) their right to have writs of execution and public auctions conducted thereon executed by the Sheriff's Office honestly, fairly, and free from craft, trickery, deceit, corruption, dishonesty, and fraud; and
> (3) their right to have payments on judgments collected and remitted by the Sheriff's Office honestly, fairly, and free from craft, trickery, deceit, corruption, dishonesty, and fraud; and
> c. The citizens of Cook County, Illinois, of the loyal and faithful services of defendants Chester Folak and Hyman Schmidt.

Folak now contends that because the indictment included language based on an intangible rights theory, *McNally* requires us to set aside his conviction.

## II

Folak sought relief in the district court both in the form of a petition for a writ of error coram nobis, 28 U.S.C. § 1651, and as a motion to vacate or set aside his sentence pursuant to 28 U.S.C. § 2255. Although both methods provide a similar vehicle for collaterally attacking a criminal

conviction, involving similar standards of review, *see United States v. Keane*, 852 F.2d 199 (7th Cir.1988), the two are not interchangeable. Relief in the nature of a writ of coram nobis is only available to the extent that it has not been replaced by other statutory remedies, *United States v. Darnell*, 716 F.2d 479, 481 n. 4 (7th Cir. 1983), *cert. denied*, 465 U.S. 1083, 104 S.Ct. 1454, 79 L.Ed.2d 771 (1984), and is generally invoked only by those defendants who cannot fulfill § 2255's custody requirement. *See, e.g., Id.; Keane*, 852 F.2d 199, 202–03. Because he remains in custody, Folak's recourse is via § 2255, not coram nobis.

■ We have expressly held that *McNally* applies retroactively on collateral attack of a conviction. *Magnuson v. United States*, 861 F.2d 166, 167–68 (7th Cir.1988). Thus, we need only determine whether Folak's convictions were properly obtained, in light of *McNally*. Although we have set aside a number of defendants' mail fraud convictions where they had been indicted for scheming to defraud victims *solely* of some intangible right, *see Magnuson, supra; Ward v. United States*, 845 F.2d 1459 (7th Cir.1988); *United States v. Holzer*, 840 F.2d 1343 (7th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 2022, 100 L.Ed.2d 608 (1988) (*"Holzer II"*), the presence of some language referring to an intangible rights theory is not always fatal to the indictment. For example, where an indictment alleges multiple schemes, some of which serve to defraud victims of property and others that deprive them of some intangible right, we have treated as surplusage any intangible rights theory of fraud that was "easily separable" from allegations of a scheme to defraud of money or property. *United States v. Eckhardt*, 843 F.2d 989, 997 (7th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 106, 102 L.Ed.2d 81 (1988); *United States v. Cooke*, 833 F.2d 109, 110 (7th Cir.1987). We have also held that where a single set of facts establishes both a scheme to defraud a victim of money or property, as well as a deprivation of some intangible right, *McNally* does not require setting aside the conviction. *United States v. Bonansinga*, 855 F.2d 476, 478–79 (7th

Cir.1988); *United States v. Wellman*, 830 F.2d 1453, 1462–63 (7th Cir.1987). In each of the above cases, we have looked beyond the language used to characterize the scheme in the indictment, to the underlying substance of the indictment, in order that we might determine if it ultimately alleges a scheme involving money or property. Under *McNally*, an indictment alleges a violation of the mail fraud statute if it charges a defendant with conduct that would normally result in some kind of "concrete economic harm." *Wellman*, 830 F.2d at 1462.

In this case, the indictment alleged that Folak's actions were both a deprivation of tangible property and an abuse of public trust; it alleged that each time Folak and his co-defendants made their own arrangements for disposing of a debtor's property rather than holding a public auction and remitting all of the proceeds, they had deprived either the State of Illinois and/or individual judgment creditors of both money *and* the right to have the proceedings conducted honestly. Thus, we have a situation like that in *Bonansinga* and in *Wellman*, where "the indictment charges but a single scheme to defraud which had the dual effect of depriving the public of *both* tangible (money and property) and intangible (honest and faithful service) rights." *Bonansinga*, 855 F.2d at 478–79 (emphasis in original). In this case, as in *Bonansinga* and *Wellman*, "the government could not logically prove one scheme without proving the other since the elements of the two were identical." *Id., quoting Wellman*, 830 F.2d at 1463.

Here, all of the evidence introduced to support the government's intangible rights theory also demonstrated that Folak had participated in a scheme to deprive the state and judgment creditors of property and money. Folak argues that the evidence did not show any *definite* monetary or proprietary loss on the state's part; he claims the state never recovers the entire amount of a seizure warrant even at an honestly conducted public auction, and that it will sometimes even settle on a percentage of the warrant without selling the busi-

ness. Thus, he argues, we cannot know whether the amount the state actually did receive in each instance was as much or perhaps even more than it would have received at a public auction.

Even assuming that Folak's theory about the unpredictability and potential informality of the seizure warrant process is true, we nonetheless conclude without hesitation that the result of his scheme was to deprive the state of property and money. In each case where a seizure warrant had issued, the Illinois Department of Revenue had a statutory right to seize and sell the deliquent taxpayer's property, as well as a corresponding entitlement to the proceeds of any sale of the business, up to the amount of the seizure warrant.[1] Therefore, even if we were to ignore Folak's duty to hold a public auction and instead assume that each "sale" of a business to the original owner conducted by Folak was entirely proper procedurally (and returned a fair price), the state nonetheless had a valid property interest in *all* of the proceeds of each sale up to the amount stated in the seizure warrant. As the evidence established, however, in each and every instance, Folak and his co-defendants either pocketed a portion of the money paid by the debtor, or helped themselves to a portion of the business' inventory prior to sale, or both. Thus, on each and every count of mail fraud that Folak was convicted, we can readily identify some money or property of which the state was deprived.[2] Under these circumstances, the government has alleged and proven a scheme to defraud of money and property, conduct clearly proscribed by the mail fraud statute.

Folak nonetheless maintains that because the district court characterized most of the payments made by the debtors to Folak and his co-defendants as bribes "intended to influence Folak in the exercise of his authority to execute seizure warrants and writs of execution," they were never "intended for" the state and therefore cannot be considered "property" of which the state was deprived. This argument has its genesis in *Holzer II*, 840 F.2d 1343, where we held that the government could not demonstrate that the State of Illinois had a property interest in bribes received by Cook County Circuit Court Judge Holzer, despite the fact that, under Illinois law, a constructive trust on behalf of the state had been imposed on the bribery receipts. We explained that in accepting bribes from the parties in cases before him, "Holzer [was] not accused of having diverted to his own pocket money intended for his employer; the State of Illinois does not sell justice." *Id.* at 1348. We noted further that,

> [i]f an employee receives a payment intended for his employer and pockets it rather than hands it over, he has defrauded the employer.... It is another thing to say that retaining a bribe deprives one's employer of property. The money was never intended for the employer ... [T]aking one's employer's property by fraud and failing to convey the receipts of bribery to one's employer are not the same acts.

*Id.* at 1347. In Holzer's case, we concluded that "[u]nless we assume unreasonably that the state wants Holzer to take bribes

---

1. *See, e.g.,* Ill.Rev.Stat. ch. 120 ¶ 444f (1985), which establishes this right and provides for the relevant procedures where, for instance, a business is in arrears on its Retailer's Occupation Tax.

2. Both parties claim that there was no "loss" to the state resulting from Count 47. Although the scheme alleged there was much like the others, it never reached fruition because the owner of the business could not find anyone to pose as the fictional purchaser and the defendants could not agree among themselves on who should buy the business. No auction, rigged or otherwise, was ever held and apparently no money changed hands, although Folak did cause a Notice of Sale to be mailed—a mailing that was in furtherance of the scheme. The government argues that the conviction on this count was nonetheless valid because the mail fraud statute punishes the *scheme* to defraud and does not require a *showing* of an *actual loss* to the victim. In our view, however, even this count represents a loss to the state because presumably the state would have received some money, had Folak just sold the assets at auction as he should have, rather than abandoning the sale altogether because he could not line up a fraudulent purchaser.

so that it can recoup them under constructive-trust principles, the state's financial situation is the same whether he takes bribes or doesn't take bribes." *Id.* at 1348.

This case, however, is not the *Holzer II* case, for a number of reasons. First, and foremost, though the payments the debtors made to Folak may have served the purpose of bribes, those bribes ultimately came directly from the proceeds of the "sale" of each business, proceeds that belonged entirely to the state by virtue of the statutory right that the Department of Revenue had to them. Unlike *Holzer II,* the state's financial situation in this case was definitely worse as a result of Folak's bribe-taking. In each instance alleged and proved, the bribe money òr pilfered inventory that went to Folak and his cohorts was money or property that should have been returned to the state toward payment of the debtor business' tax delinquency. The only way Folak was able to retain the bribes was by fraudulently representing to the Department that the "sales" of the debtors' assets had netted less than they actually had. Having pocketed the money and carried off inventory which belonged to the State of Illinois, Folak clearly defrauded his employer of tangible property in every sense of the word.

### III

The indictment alleged and the stipulated facts proved that Chester Folak and his co-defendants engaged in a scheme to defraud the State of Illinois and private judgment creditors of both money and property. Clearly, this is conduct proscribed by the mail fraud statute, even after the Supreme Court's decision in *McNally.* The district court's denial of Folak's motion to set aside his conviction is therefore

AFFIRMED.