Richard F. LeFEVOUR, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 84 CR 837.

United States District Court, N.D. Illinois, E.D.

Aug. 29, 1990.

**580**

Candace Fabri, Chicago, Ill., for U.S.

## ORDER

NORGLE, District Judge.

Before the court is the 28 U.S.C. § 2255 petition of Richard F. LeFevour. On July 13, 1985, after a seven week trial, LeFevour was convicted of 53 counts of committing mail fraud[1], five counts of filing false tax returns,[2] and one count of violating the Racketeering Influenced and Corrupt Organizations Act[3] ("RICO"). On August 27, 1985, LeFevour, in poor physical health, was sentenced to an aggregate of twelve years in the custody of the Attorney General—three year concurrent sentences on each mail fraud count, two year concurrent sentences on each tax count, and seven years on the RICO count. The Seventh Circuit rejected LeFevour's direct appeal. *See United States v. LeFevour*, 798 F.2d 977 (7th Cir.1986). Now, through this habeas corpus petition, LeFevour collaterally challenges his mail fraud convictions as resting solely on the "intangible rights" theory invalidated in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987).

## FACTS

LeFevour was a judge of the Circuit Court of Cook County, Illinois from 1968 to 1984. He gained notoriety as the central figure in the corruption of the state courts in Cook County, exposed in an undercover operation known as "Operation Greylord." The evidence admitted at his trial compelled the conclusion that LeFevour was a corrupt judge, who, not content with "selling his own robe" on a daily basis, urged and facilitated the corruption of not only

**1.** *See* 18 U.S.C. § 1341.

**2.** *See* 26 U.S.C. § 7206(1).

**3.** *See* 18 U.S.C. § 1962(d).

lawyers and court personnel, but also of other judges under his supervision, for his own profit.

For nearly his entire tenure on the bench, LeFevour engaged in a number of bribery schemes, taking cash and a variety of services. A brief description of certain of them is in order. From 1969 until 1981, when he left Traffic Court, he accepted bribes for favorable dispositions of drunk driving cases. His "going rate" was $100, and he received this on hundreds of occasions between 1969 and 1972 from numerous different corrupt lawyers, most of whom have been convicted in separate cases.

Between 1978 and 1981, LeFevour also accepted bribes for dismissing the parking tickets of multiple violators. In this scheme the "going rate" was usually one-half of the total amount owed on all tickets issued to a given violator. The basic structure of the parking ticket scheme was simple. LeFevour had three Chicago policemen working as his bagmen. Each contacted parking violators with at least ten outstanding tickets, informed the violators that they could arrange for the tickets to be dismissed for approximately one-half the total amount of money due, and then brought LeFevour both the cash collected from the violators and the necessary papers so that he could dismiss the tickets. LeFevour dismissed hundreds of parking tickets in this manner. The cash payments were usually handed to LeFevour in his court chambers, and he put the cash into his pockets or his desk. Traffic fines are normally paid to the Circuit Court, with the funds collected on tickets issued by the City of Chicago passed along to the municipal authorities. *See* Ill.Rev.Stat. ch. 95½, ¶ 16–105. Although the violators often were given the impression and professed to actually believe that they were properly paying their parking fines, when LeFevour dismissed tickets in exchange for a bribe no money was received by the Clerk of the Court, the City of Chicago, or any other public treasury. LeFevour, by way of his bagmen, diverted the money paid by the parking violator from the court and the municipality, keeping it all for himself and his underlings. *Id.* Where the parking violator had already been arrested and posted a cash bond, LeFevour also arranged for the return of the cash bond refund.

LeFevour was also not adverse to accepting payment "in kind." He engaged in a variation on his parking ticket scheme in exchange for the free use of new automobiles from an auto leasing company. When individual lessees received parking tickets, the leasing company was ultimately responsible for the tickets. From 1976 to 1982, LeFevour disposed of these tickets by impleading the individual lessees as defendants. Once the individual lessees were impled, it was the policy of the City not to require payment from the leasing company. In return for effectively letting the leasing company off the hook, LeFevour received free use of a new car each year. The leasing company was clearly able to pay substantial fines.

Once LeFevour left Traffic Court to become Presiding Judge of the First Municipal District in 1981, he began engaging in a new bribery scheme known as the "Hustlers' Club." A hustler is a corrupt lawyer who seeks out persons who have been arrested and posted cash bonds. In violation of Circuit Court of Cook County rules, the hustler approaches these criminal defendants as they arrive for court appearances, offering to represent them and implying a favorable result if they will sign over to the hustler the cash bond refunds ("CBRs"). The defendants are entitled to the CBRs at the end of their cases, if their case is disposed of favorably to them and the money the CBRs represent not totally depleted by fines or court costs. Under the Hustlers' Club scheme, a number of corrupt lawyers paid monthly cash bribes to LeFevour, in exchange for the "privilege" of hustling clients. Obtaining the CBRs was an essential part of the hustling scheme, since these bribes were funded, in part, by the CBRs. Therefore, LeFevour, using his power as Presiding Judge, took the extra step of making sure that the judges assigned to Hustlers' Club courtrooms would cooperate with the scheme.

To ensure their cooperation, these judges were also paid bribes by members of the Hustlers' Club. From May 1981 until the hustling scheme ended in August, 1983 (when Operation Greylord was made public), LeFevour received $2,000 in bribes each month from the Hustlers' Club lawyers.

In order to cover up his illegal conduct and effectively increase his "income", LeFevour concealed from the Internal Revenue Service the income he received from these bribery schemes by filing false income tax returns. From 1978 to 1982, LeFevour failed to report over $90,000 in income, and falsely reported approximately $61,000 in bribes as income from gambling and art sales. Finally, LeFevour also covered up his schemes by failing to report his income from these bribery schemes on the statements of economic interest he was required to file each year with the Illinois Supreme Court. From 1972 through 1984, LeFevour reported on his annual economic interest statements that he had no economic interests or relationships that might create a substantial conflict of interest for him as a judge. Never did he report any payments from attorneys to influence his official duties, nor did he report that he had received the use of free automobiles and also office equipment for personal use.

## DISCUSSION

LeFevour's mail fraud convictions are based upon two of the separate bribery schemes discussed above; taking money or payment in kind in exchange for dismissing parking tickets (Counts 2 through 36), and taking money in exchange for permitting attorneys to hustle clients. (Counts 37 through 54). LeFevour contends that the indictment, evidence, and jury instructions relating to both the parking ticket and the hustling schemes were consistent only with an intangible rights theory, thereby rendering his convictions invalid under *McNally*.[4] If LeFevour prevails, his aggregate sentence would be reduced from twelve to nine years incarceration.

The mail fraud statute prohibits the use of the United States mails to execute "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ...." 18 U.S.C. § 1341. In *McNally*, the Supreme Court unexpectedly held that "[t]he mail fraud statute clearly protects property rights, but does not refer to the intangible right of the citizenry to good government." 107 S.Ct. at 2879. Thus, while the fraudulent deprivation of property, whether it be tangible or intangible, *see Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), falls within the purview of the mail fraud statute, the fraudulent deprivation of the intangible right of good government or "faithful service", or other intangible rights, does not.

Because the rule announced in *McNally* applies retroactively, *see Messinger v. United States*, 872 F.2d 217, 220 (7th Cir. 1989) (*citing United States v. Folak*, 865 F.2d 110, 113 (7th Cir.1988); *Magnuson v. United States*, 861 F.2d 166, 167 (7th Cir. 1988)), the Courts of Appeal have been called upon to review numerous pre-*McNally* mail fraud cases, such as this one, prosecuted under an intangible rights theory. *McNally* has not been treated as a rule of pleading, *United States v. Wellman*, 830 F.2d 1453, 1563 (7th Cir.1987), for to do so would render infirm every case prosecuted under an indictment alleging fraudulent deprivation of the right to good government. Instead, the Seventh Circuit has recognized that "[t]he legal characterization the indictment places on the scheme should not obscure the fact that the specific conduct alleged in the indictment is clearly proscribed by the mail fraud statute." *United States v. Cosentino*, 869 F.2d 301, 306 (7th Cir.1989) (*quoting Wellman*, 830 F.2d at 1462) Thus, the inquiry is of the specific acts alleged, focusing not on the language used to describe them, but on the

---

**4.** He also argues that his conviction should be vacated because his false financial disclosure statements constituted deprivations of intangible rights only. However, the jury was specifically instructed that LeFevour was not charged with any offense based upon misstatements or omissions from his financial disclosure statements.

substance of the actions. *See Messinger*, 872 F.2d at 221. Consequently, the presence of intangible rights language is not necessarily fatal. *See Id.* Often the same scheme may simultaneously work a deprivation of an intangible right and a deprivation of a property right, *see United States v. Doe*, 867 F.2d 986, 988–89 (7th Cir.1989), or create a substantial potential to deprive another of property. *See United States v. Keane*, 852 F.2d 199, 205 (7th Cir.1988). A true intangible rights case is one that only involves "rights whose violation would ordinarily result in no concrete economic harm; ..." *United States v. Bailey*, 859 F.2d 1265 (7th Cir.1988).

■ If it is determined that the scheme defrauded another of a property right, then the reviewing court must determine whether despite the fact that the case was prosecuted under an intangible rights theory, the jury necessarily had to convict the defendant for defrauding another of a property right. This entails examining the indictment, the evidence, and the jury instructions. *See Messinger*, 872 F.2d at 221.

■ Since LeFevour has not previously raised the intangible rights argument, he may only obtain habeas corpus relief under § 2255 if he can show both cause and prejudice. *See United States v. Frady*, 456 U.S. 152, 167, 102 S.Ct. 1584, 1594, 71 L.Ed.2d 816 (1982). LeFevour obviously has cause for not raising the intangible rights argument at trial or on direct appeal. Before *McNally* "federal appellate and district courts had universally rejected this argument," *Messinger*, 872 F.2d at 220, and *McNally* was not decided until after LeFevour's conviction was affirmed. The court will now address whether LeFevour suffered actual prejudice from the government's use of the intangible rights theory with respect to the counts relating to either the parking ticket or hustling scheme.

## THE PARKING TICKET SCHEME

■ Parking tickets represent a property interest and LeFevour's parking ticket scheme caused a deprivation of this property interest. Each ticket constitutes a legal claim by the City against the violator. The ticket represents a cause of action which, though intangible, is unquestionably property. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428, 102 S.Ct. 1148, 1153, 71 L.Ed.2d 265 (1982). LeFevour contends that the dismissal of parking tickets does not constitute a deprivation of property because the tickets constituted mere legal claims and that the government did not establish the City's right to the ticket revenue since there was no evidence regarding the factual basis for the tickets. LeFevour is incorrect. The tickets constituted property even if they were only legal claims[5]. That a claim may be contested as to liability may affect its value, but it does not affect its status as property. Moreover, the inference from the testimony of the parade of witnesses is that they believed they were pleading guilty to and paying a fine on one-half of the multiple tickets they had received in return for a formal dismissal by the judge of the others. The bagmen and LeFevour put what rightly was the tangible property of the City, the cash fine payments, into their own pockets. Once LeFevour dismissed the tickets, the City lost its cause of action and was thereby deprived of property. The court rejects LeFevour's argument that the City never actually lost its claims when he dismissed tickets for bribes. These tickets were *actually* formally dismissed. While LeFevour was acting improperly, his actions as the "agent" of the municipality, if not dispositive, certainly created obstacles to the City's collection of fines on tickets dismissed through bribery (the violator would have to "pay twice"), resulting in, at least, a "substantial potential" to deprive the City of property.

5. Furthermore, since the tickets were property as a matter of law, no evidence was necessary to establish the factual basis underlying them. That the City of Chicago was interested in preserving its legal claims is shown by its awarding contracts to assist in collection efforts. "In the spring of 1985, the City of Chicago awarded a contract to the Datacom Company to collect over $600 million in overdue parking fines owed to the City." *United States v. Davis*, 890 F.2d 1373, 1375 (7th Cir.1989).

■ Although LeFevour did not completely dismiss the auto leasing company's tickets, his scheme with them also deprived the City of property. Since it was the City's policy not to pursue the lessor once the lessee was impled, during the six years this scheme was in place, the certain leasing company was not required to pay any of its parking tickets while other leasing companies paid thousands of dollars in fines. Although the City could theoretically have required payment from the auto leasing company at any time, since the tickets were not actually dismissed, the practical effect of LeFevour's conduct was to keep the City from pursuing its claims against and collecting money from them. That a legitimate municipal policy was subject to abuse does not legitimize the misconduct of the abusers. Moreover that, as LeFevour recognizes, the leasing company could have legitimately sought and obtained impleader of the lessees is irrelevant. The leasing company's conduct still · amounted to bribery.

■ Moreover, LeFevour's scheme also deprived the City of its interest in cash bonds. Arrest warrants are routinely issued for parking violators who accumulate ten tickets within a year and fail to pay the fines or appear in court. ˙ Once the violator is arrested, he must pay the fines immediately or else post a bond. *See* Municipal Code of the City of Chicago § 27–387. Most of the tickets that LeFevour dismissed were ones on which arrest warrants had already issued—one of LeFevour's bagmen specifically recruited individuals to participate in the scheme from the list of violators he was supposed to arrest. But for LeFevour's scheme, these violators would have been arrested pursuant to the warrants and then required to pay the fines or post bond. LeFevour dismissed the tickets and interrupted the process, depriving the City of both fines and bonds. The fines are obviously property, and a cash bond posted after an arrest, as a security inter-

est, constitutes property as well.[6] *See Messinger*, 872 F.2d at 220.

■ Finally, there are bribes themselves, and the circumstances under which they were given, which clearly demonstrate that the bribe money LeFevour and his bagmen received was the actual money that should have gone to the City. Normally, when a violator makes a payment to settle his parking tickets, the money goes to the City. The violators involved in the scheme believed that they were making legitimate payments on their fines and were unaware of where their money was actually going. LeFevour's scheme diverted the money from the City. Where *Keane* only involved a substantial potential to take money by fraud (which was sufficient), LeFevour, through his bagmen, physically took money intended for the City and stuffed it into his own pockets. This case is unlike *United States v. Holzer*, 840 F.2d 1343 (7th Cir. 1988), where the corrupt judge's conduct did not affect the City's financial situation, but struck others substantially.

■ Having found that the scheme caused a deprivation of property, the court now considers the indictment, evidence, and jury instructions to determine whether the jury necessarily had to convict LeFevour for fraudulent deprivation of property. *See Messinger*, 872 F.2d at 221.

An indictment cannot be questioned under § 2255 "unless it is so defective on its face as not to charge an offense under any reasonable construction." *Burchfield v. United States*, 544 F.2d 922, 924 (7th Cir. 1976), *cert. denied*, 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977). Count Two of the 59–Count indictment describes the parking ticket scheme as one to defraud:

> (a) The Circuit Court of Cook County and the citizens of Cook County of their right to the loyal, faithful and honest services of RICHARD F. LeFEVOUR in the performance of acts related to his public employment as a judge of the Circuit Court of Cook County;

---

**6.** Parking violators were occasionally permitted to sign a personal recognizance bond rather than posting a cash bond. A recognizance bond is still a security interest, and thus property,

because the sum fixed in the bond is entirely forfeited if the defendant does not appear as required. Ill.Rev.Stat. ch. 38, ¶ 110–2.

(b) The Circuit Court of Cook County, and the citizens of Cook County, the public officials and public employees of Cook County of their right to have the business of the Circuit Court of Cook County conducted honestly, fairly, impartially, free from corruption, collusion, partiality, dishonesty, conflict of interest, bribery and fraud, and in accordance with the statutes of the State of Illinois and the Standards and Rules of the Supreme Court of Illinois governing judicial conduct;

(c) The citizens of the State of Illinois, the Secretary of the State of Illinois, the Supreme Court of Illinois, the Illinois Courts Commission, and the Illinois Judicial Inquiry Board of their right to be fully and honestly advised of the economic interest and financial relationships of RICHARD F. LeFEVOUR as a judge of the Circuit Court of Cook County and an elected official of the State of Illinois, in order to determine that the economic interests and financial relationships of judges and elected officials are free from corruption, collusion, partiality, dishonesty, conflict of interest, bribery and fraud; and

(d) The City of Chicago of revenue rightfully due to the City as payment for numerous unpaid parking tickets.

This indictment clearly "charges a defendant with conduct that would normally result in some kind of 'concrete economic harm.'" *Wellman*, 830 F.2d at 1462. Subparagraph 2(d) specifically alleges that Le-Fevour defrauded the City of revenue. Paragraphs 3 through 7 of Count Two, in describing the details of the parking ticket scheme, repeatedly state that LeFevour disposed of parking tickets "without requiring the payment of any money to the City of Chicago." As the substantive allegations of the indictment set forth a scheme to deprive the victim of property rights, it is sufficient under *McNally*. *See United States v. Doe*, 867 F.2d at 988–89 (7th Cir.1989). That the indictment also includes language based on the intangible rights theory invalidated in *McNally* is thus of no consequence.

■ With respect to the evidence at trial, for purposes of this inquiry it is crucial that the sole basis for the intangible rights allegations was the bribery scheme. Proof of the intangible rights allegations in this case totally depended upon the same facts as the property charges, and thus the government could not have proven one scheme without proving the other. By taking bribes and disposing of tickets, LeFevour both deprived the citizens of Cook County and others of certain intangible rights and deprived the City of money. When the jurors found that LeFevour defrauded victims of intangible rights to impartial judicial service, they necessarily had to find that he had defrauded the City of property by taking bribes in exchange for dismissing tickets.

This Circuit has repeatedly held that where the single set of facts alleged in the indictment and proved at trial established both a scheme to defraud the City of money as well as a deprivation of a intangible right, the mail fraud conviction is valid regardless of the precise language of the indictment. *See Messinger*, 872 F.2d at 222; *Folak*, 865 F.2d at 113; *Cosentino*, 869 F.2d at 307; *Wellman*, 830 F.2d at 1463.

■ Finally, LeFevour challenges his parking ticket scheme conviction on the basis that the jury instructions allowed the jury to convict based solely on the intangible rights theory. The instructions must have been more than just erroneous for his conviction to be vacated at this juncture.

> The question in such a collateral proceeding is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even universally condemned.

*Doe*, 867 F.2d at 990 (*quoting Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977)). In making this determination, the court examines "the jury charge as a whole rather than focusing on isolated passages." *Bailey*, 859 F.2d at 1277. Furthermore, the instructions must be viewed "in the context of the

overall trial and the arguments by counsel." *Id.*

The basis for LeFevour's challenge is the instruction which stated that "the government must prove the scheme to defraud alleged in paragraph 2(a) or 2(b), or 2(c), or 2(d), but [need] not prove all of them." Subparagraphs 2(a), 2(b), and 2(c) all alleged deprivations of intangible rights, while subparagraph 2(d) alleged a deprivation of property.

Because the Court also instructed the jury that the government must prove that the defendant "knowingly participated in the scheme to defraud *as described in the various counts of the indictment,*" the challenged instruction was harmless error. There was only one parking ticket scheme described in the indictment and proved at trial, although it resulted in deprivations of both intangible and property rights. Because the charge included a reference to the scheme alleged in the indictment, the single instruction LeFevour challenges was not unduly prejudicial in light of the instructions as a whole. *See Messinger,* 872 F.2d at 224; *Doe,* 867 F.2d at 990.

Moreover, even viewed in isolation, the challenged instruction was harmless since there was absolutely no way for the jury to find LeFevour guilty of the allegations in subparagraphs 2(a), 2(b), or 2(c)—deprivations of intangible rights, without also finding him guilty of the property deprivations alleged in subparagraph 2(d). Based upon the evidence at trial, the jury could not have found that LeFevour defrauded the citizens of Cook County of their right to his honest services without finding that he had defrauded the City of revenue, for other than the bribery scheme there was no other basis for finding that he had acted dishonestly. *See United States v. Bonansinga,* 855 F.2d 476, 479 (7th Cir.1988). The challenged instruction by no means "so infected the entire trial" that the resulting conviction violates due process.

LeFevour's motion, to the extent it seeks to vacate his convictions based on the parking ticket scheme, Counts 2 through 36, is denied.

## THE HUSTLERS CLUB SCHEME

As noted above, the Seventh Circuit has recognized that cash bail bonds, which are security interest, constitute property rights. *See Messinger,* 872 F.2d at 220. In the Hustlers' club scheme, the corrupt lawyers' role was to find and arrange to represent defendants who had posted cash bonds, with the understanding that the attorney would receive the defendants' CBRs as payment. The CBRs were integral to this scheme, for the source of the bribes was the CBRs. LeFevour did not require that he be paid any bribes until after the Club had been in operation for a few weeks so that the attorneys would have the chance to collect sufficient CBRs from which to pay the bribes. When the attorneys later sought to cut their monthly bribes to LeFevour in half, they complained to LeFevour's bagman, who in turn relayed the message to LeFevour, that "they weren't making enough money *in those courtrooms* to afford the current amount." Similarly, when the attorneys first proposed the scheme, they explained to both LeFevour and the judges presiding over the Club courtrooms that they would pay off the presiding judges "after they made a certain amount of money in each of the club courtrooms." Thus, the very point of the Hustlers' Club scheme was to use the CBRs to generate income for all of the participants; the attorneys essentially acted as conduits, obtaining the CBRs from the defendants and then passing along a share of the funds to the various judges. The corrupt judges in the Club courtrooms had a strong incentive to dispose of hustled cases quickly and favorably to the defendant in order to ensure that Club participants received a constant flow of CBRs from which to pay bribes. Making preliminary rulings favorable to the hustlers' clients had the effect of terminating their cases prematurely, was depriving the state of property by accelerating the return of the cash bond. *See Messinger,* 872 F.2d at 221. Even in cases where the corrupt judges did not actually accelerate the return of the cash bond, there was still a property deprivation because the CBRs were perverted in that they were now in-

tended to be used for bribes rather than as security. *See Ward v. United States*, 845 F.2d 1459, 1462 (7th Cir.1988). At the very least, this scheme had a significant potential to deprive Cook County of its property rights in the bonds, and no more is required. *See Bailey*, 859 F.2d at 1276; *Keane*, 852 F.2d at 205.

Because the success of the scheme here depended upon a sufficient flow of CBRs to the hustlers, this case is readily distinguishable from *Ward* where the cash bond was refunded in the ordinary course and the state's property interest in the bond was not affected by the use Ward made of it after it was returned. 845 F.2d at 1462. Unlike this case, the judge in Ward received his bribe before any cash bond funds were returned and did not necessarily even know that the return of the funds was part of the scheme. *Ward*, 845 F.2d at 1461. In fact, as the Seventh Circuit noted, the judge could have carried out his part of the agreement even if he had sentenced the defendant to a fine equal to the cash bond rather than imprisonment. *Ward*, 845 F.2d at 1462. In the present case, by contrast, the bribes were paid from cash bond refunds, and all of the parties recognized that the more cash bond refunds that were returned, the more they stood to profit. That LeFevour did not necessarily receive the identical bills generated by the CBRs is not fatal. Whereas the point of the scheme in *Ward* was just to obtain a favorable decision in exchange for cash, the point of the scheme here was to obtain the CBRs; after all, the agreement only provided for the attorneys to hustle defendants who had posted cash, and the bribes were only to be paid after the attorneys had time to collect sufficient CBR funds. LeFevour's scheme unquestionably "impaired or endangered" the state's interest in the bonds. *See Ward*, 845 F.2d at 1463. Furthermore, *McNally* does not require that actual loss of money or property be alleged in the indictment. *See United States v. Bucey*, 876 F.2d 1297, 1311 (7th Cir.) ("[S]ince the mail fraud statute punishes the *scheme* to defraud, this court has reiterated on numerous occasions that the ultimate success of the fraud and the actual defrauding of a victim are not necessary prerequisites to a successful mail fraud prosecution.") (citations omitted & emphasis in original). *cert. denied*, —— U.S. ——, 110 S.Ct. 565, 107 L.Ed.2d 560 (1989).

Since the Hustlers' Club scheme caused a property deprivation, the indictment, evidence, and jury instructions must now be examined to determine whether the jury necessarily had to convict LeFevour for defrauding Cook County of its property rights in the cash bonds. *Messinger*, 872 F.2d at 221.

■ With respect to the indictment, looking beyond the language used to characterize the scheme to the underlying substance of the indictment, it ultimately alleges a scheme involving money or property. *See Folak*, 865 F.2d at 113. Paragraph 2 of the Hustlers' Club counts describes the scheme using only the intangible rights language fund in subparagraph 2(a) through 2(c) of the parking ticket counts. However, this is not fatal because paragraph 11 of the Hustlers' Club counts alleges that:

> It was further a part of the scheme to defraud that [the attorneys] received by mail cash bond refunds ... for the cases they obtained, solicited, and "hustled" at the Branch Courts in connection with their cash payments to RICHARD F. LeFEVOUR.

The hustlers received CBRs as a result of their agreement with LeFevour, making clear the connection between the CBRs and the payments LeFevour received. Furthermore, as with the parking ticket scheme, there is only one scheme alleged relating to the Hustlers' Club; the jury could not have convicted LeFevour on the Hustlers' Club counts without finding that he participated in the scheme to deprive Cook County of its interest in the cash bonds. *See Messinger*, 872 F.2d at 222; *Cosentino*, 869 F.2d at 307; *Folak*, 865 F.2d at 113; *Bonansinga*, 855 F.2d at 479.

As for the evidence presented at trial, it clearly established a scheme to deprive Cook county of its interest in the cash bonds. Jimmy LeFevour testified at great

length as to how the Hustlers' Club was established, and he specifically stated that Judge LeFevour approved the plan whereby the attorneys would hustle clients, obtain the clients' CBRs, and then use the CBRs to pay the necessary bribes. The government also presented evidence showing that the hustlers received an enormous number of CBRs in the Club courtrooms and that the scheme was quite profitable for all of the participating faitors. For example, one attorney who paid LeFevour for the privilege of hustling received 628 bonds totaling $72,145 in one courtroom from June 1982 until August 6, 1983, when the scheme ended. From August 6, 1983 through December of 1983, by contrast, this attorney received only 24 bonds totaling $3,260. The Club was equally profitable for LeFevour, who received monthly bribes of approximately $2,000. The government was not required to present evidence as to the precise value of the property lost by Cook County. Some of the bonds might have gone to these attorneys even if the Club did not exist. Some of the defendants represented by hustlers might have had their cases terminate favorably by an honest judge and would have been entitled to a CBR. However, the mail fraud statute "seeks to prevent fraudulent conduct regardless of whether there is any loss or damage to the victims of the crime." *United States v. Lovett*, 811 F.2d 979, 983 (7th Cir.1987). ("[T]he mail fraud statute proscribes fraudulent *schemes;* it does not confine penalties to those whose schemes succeed in raking off cash ....") *Keane,* 852 F.2d 199, 204.

This court gave the jury one set of instructions for both the parking ticket allegations and the Hustlers' Club allegations and as discussed above those instruction did not so infect the entire trial that the resulting conviction violates due process. *See Doe,* 867 F.2d at 990. Although the instruction as to the Hustlers' Club scheme refers to the allegations in subparagraph 2(a), 2(b) and 2(c) which rely on the intangible rights theory, it also stated that the government must prove that the defendant "knowingly participated in the scheme to defraud as described in the various counts

of the indictment." The only schemes described in the indictment involved deprivations of property rights, therefore the jury instructions viewed as a whole were not unduly prejudicial. *See Messinger,* 872 F.2d at 224. An indictment alleging a deprivation of property rights is not defective under *McNally* just because it also alleges a deprivation of intangible rights. *Ranke v. United States,* 873 F.2d 1033, 1035 (7th Cir.1989) *Doe,* 867 F.2d at 988–89.

Accordingly, LeFevour's motion, to the extent it seeks to vacate his convictions based on the Hustlers' Club scheme, Counts 37 through 54, is also denied.

### CONCLUSION

For the reasons set forth above, LeFevour's motion to vacate his convictions on Counts 2 through 54 is denied in its entirety.

IT IS SO ORDERED.