**UNITED STATES of America, Plaintiff,**

v.

**Ira B. KRISTEL, Defendant.**

**No. 90 Cr. 0641(CLB).**

United States District Court,
S.D. New York.

April 23, 1991.

William B. Wachtel, Elliot Silverman, Donna Recant and Stuart E. Abrams, New York City, for defendant.

Otto G. Obermaier by Barbara Guss and Helen Gredd, Asst. U.S. Attys., S.D.N.Y., White Plains, N.Y., for plaintiff.

## MEMORANDUM AND ORDER

BRIEANT, Chief Judge.

Defendant has moved prior to trial to dismiss this criminal prosecution for violation of the rule of *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). A pre-trial evidentiary hearing has been held. The facts developed at that hearing are set forth below. By indictment filed October 2, 1990, Ira B. Kristel is charged on one count of conspiracy to commit mail fraud beginning in the autumn of 1984 and continuing at least through September 1988, in violation of 18 U.S.C. § 371, and eight counts of mail fraud, 18 U.S.C. § 1341. The underlying facts show that Mr. Kristel caused his family-owned corporation, Commercial Envelope Manufacturing Company ("Commercial Envelope"), to make payments to a dummy or conduit corporation, Burke, Wainwright & Evans, Inc.

The principal of Burke Wainwright & Evans was Irene Walsh, the wife of Brian Walsh. Burke Wainwright had no legitimate business and operated out of a mail drop in White Plains, New York. Brian Walsh was employed by Merrill Lynch as a purchasing agent in its New York office. The indictment alleges that to defraud Merrill Lynch and for obtaining fraudulently increased prices on Commercial Envelope's bid for a Merrill Lynch envelope contract, and thereafter for fraudulently increasing prices charged to Merrill Lynch after the contract had been awarded to Commercial Envelope, Kristel caused his company to pay commercial bribes to Walsh.

This regretfully common practice constitutes commercial bribery, a class "A" Misdemeanor under the law of New York. *See* N.Y. Penal Law, § 180.03 (McKinney 1988 & Supp.1991). Arguably, even in the aftermath of *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), it also constitutes the Federal felony of mail fraud, 18 U.S.C. § 1341.

Before and during the course of his transactions with Walsh and Merrill Lynch, Kristel had been a "cooperating individual" in the Eastern District of New York under a written agreement of cooperation and for immunity dated March 13, 1984, in connection with the investigation and prosecution of Edward Wyatt. Mr. Wyatt, a senior official of the General Services Administration, had been appointed Deputy Regional Administrator for Region II of the General Services Administration on February 28, 1984. Kristel's cooperation included a number of meetings with the Federal Bureau of Investigation, including Special Agent Mangan. The Eastern District prosecution of Wyatt was directed by Assistant United States Attorney Andrew Jacobs, and thereafter by Assistant United States Attorney Jonny Frank.

In the fullness of time, Wyatt resigned his official position and entered a plea of guilty on the eve of trial. (*See United States v. Wyatt*, 84 Cr. 608 (November 20, 1984, E.D.N.Y.)). In connection with his sentencing before the Hon. Frank X. Altimari, then Judge of the District Court, Kristel wrote a letter urging lenient treatment of Wyatt. *See* Court Exhibit 2; Tr. at 288–91.

Defendant Kristel now claims that this prosecution in the Southern District of New York represents a violation of his rights under *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) and its progeny. Specifically, defendant contends that the Government (both the FBI and the U.S. Attorney) had made evidentiary and non-evidentiary pre-indictment use of "testimony or other information", or "information directly or indirectly derived from such testimony or other information" within *Kastigar* for such inappropriate purposes as an investigatory lead or as a means of focusing an investigation on a witness. 406 U.S. at 460, 92 S.Ct. at 1664–65. We discuss below the evolution of the *Kastigar* rule and cases decided under 18 U.S.C. § 6002 providing for compelled testimony, regarded as applicable equally to voluntary "cooperating individuals" having informal immunity by letter agreement.

### Background

This prosecution, which for convenience we will call the *Merrill Lynch* case, began

in a most fortuitous fashion, free from any taint under *Kastigar*. In October of 1986, Eileen Walsh (also known by her maiden name Eileen Jordan) presented herself at the Mount Kisco branch of the Hudson Valley National Bank with two checks from Merrill Lynch in the total amount of $640,-000.00 payable to "Commercial Paper and Envelope Company", a close variation of the name of Kristel's family corporation, which was then a regular vendor of envelopes to Merrill Lynch. The tax I.D. number of this fictitious payee, for such it was, was the tax I.D. number of Kristel's corporation with one digit deliberately transposed. Tr. at 27, 29–30. Mrs. Walsh was attempting to deposit the checks in a corporate account of Burke, Wainwright & Evans, Inc., recently opened at the Mount Kisco branch of Hudson Valley National Bank. To do this she had some contrived document which purported to inform the bank that Commercial Paper and Envelope Co., Inc. was a subsidiary of Burke, Wainwright & Evans, Inc. Tr. at 13. The bank had in its possession documents showing that Burke, Wainwright & Evans, Inc. was an existing corporation, but the entire circumstances considered in light of the size of the checks were so suspicious as to alert the bank officers that they were confronted with an attempt either to defraud the bank or to defraud Merrill Lynch. *Id.* at 13, 26–27. They telephoned the Federal Bureau of Investigation.

Special Agent John Truslow is assigned to the New Rochelle office of the Federal Bureau of Investigation. He has no official duties in connection with matters in the Eastern District of New York. In the regular course of his duties he responded to the report from the Hudson Valley National Bank. On November 6, 1986, he posed as a bank officer and after Mrs. Walsh attempted on a second visit to withdraw some funds from the previously deposited Merrill Lynch checks he arrested her for the federal crime of interstate transportation of stolen property, 18 U.S.C. § 2314. Tr. at 32. Brian Walsh was found waiting outside the bank in an automobile. A telephone call to Merrill Lynch disclosed that the checks were genuine, and that former employee Brian Walsh had penetrated the check issuing procedures of Merrill Lynch, and although not then employed there had caused Merrill Lynch to issue these two checks based on phony check authorizations.

Based on information received from Hudson Valley National Bank, Special Agent Truslow obtained a Grand Jury subpoena in the Southern District of New York for the bank records of Burke, Wainwright & Evans, Inc. at the Bank of New York in White Plains. He examined the microfilm records of the deposits and prepared a schedule of the checks in and out of the Burke, Wainwright & Evans account at the Bank of New York. Tr. at 14. Essentially all of the checks out of the account went to or for the benefit of Eileen Walsh or Burke, Wainwright & Evans. *See* Gov. Ex. 1. The checks deposited in the account included the following:

| Ch. # | Payer | Payee | Deposited | Amount |
|---|---|---|---|---|
| 60365 | Commercial Envelope Mfg. Co., Inc. | Burke W & E | 12/07/84 | $15,000.00 |
| — | Impressions | Eileen Jordan | 1/02/85 | 500.00 |
| 61226 | Commercial Envelope Mfg. Co., Inc. | Burke W & E | 1/16/85 | 15,000.00 |
| 62203 | Commercial Envelope Mfg. Co., Inc. | Burke W & E | 2/27/85 | 15,000.00 |
| 62723 | Commercial Envelope Mfg. Co., Inc. | Burke W & E | 3/18/85 | 15,000.00 |
| 63536 | Commercial Envelope Mfg. Co., Inc. | Burke W & E | 4/19/85 | 15,000.00 |
| 1036 | How–Land Printing Co., Inc. | Burke W & E | 5/28/85 | 6,152.84 |
| 64580 | Commercial Envelope Mfg. Co., Inc. | Burke W & E | 5/28/85 | 15,000.00 |
| 1020 | How–Land Printing Co., Inc. | Burke W & E | 5/28/85 | 6,875.23 |
| 1032 | How–Land Printing Co., Inc. | Burke W & E | 5/28/85 | 8,011.14 |
| 4526 | Gotham Envelope Co., Inc. | Burke W & E | 10/1/85 | 8,000.00 |
| 4550 | Gotham Envelope Co., Inc. | Burke W & E | 10/1/85 | 9,000.00 |
| 4517 | Gotham Envelope Co., Inc. | Burke W & E | 10/1/85 | 18,000.00 |

After having prepared the schedule, Special Agent Truslow interviewed Brian Walsh on December 17, 1986. Brian Walsh admitted to Agent Truslow that he had defrauded Merrill Lynch in 1985 by a similar means. He also admitted that Burke, Wainwright & Evans, Inc. was a shell company used to accept funds intended for his benefit by suppliers and vendors of Merrill Lynch. He informed the Special Agent that the initials of Burke, Wainwright & Evans stood for Brian Walsh and Eileen. Tr. at 38. Special Agent Truslow then began to visit the various vendors, including Commercial Envelope.

These visits and an interview of Gotham Envelope, one of the other sources of funds of Burke, Wainwright, resulted in the conviction in this Court of Gotham's principal. *See United States v. Goldberg*, 89 Cr. 828 (March 30, 1990).

Agent Truslow spoke to two employees at Commercial Envelope inquiring about the checks to Burke, Wainwright & Evans. These employees referred him to Attorney Wachtel. On December 30, 1986 Mr. Truslow called Attorney Wachtel to inform him that he was investigating payments made to Brian Walsh or Burke, Wainwright & Evans. Tr. at 42, 324. Truslow told Wachtel in substance that he perceived Commercial Envelope to be the victim of an extortion perpetrated by Brian Walsh and that he had "no problem with Commercial Envelope". Tr. at 43, 138, 325–26. Nevertheless, he said that he desired an opportunity to speak with Commercial Envelope's principal, and he requested an explanation of the payments from Commercial Envelope or its principals.

On January 10, 1987 Attorney Wachtel responded to this request by explaining that Mr. Kristel had caused Commercial Envelope to pay this money for "advertising". Tr. at 46, 326–27. Mr. Truslow asked to see the paperwork and the invoices. There weren't any. Tr. at 46–47.

At some date between January 10, 1987 and February 11, 1987, Tr. at 56, 58, 326, Truslow spoke with Thomas O'Connor, Supervising Special Agent with the White Collar Crime Squad in the New Rochelle FBI office, explaining that he viewed Kristel's story, transmitted through Wachtel, that the payments were for "advertising" with understandable incredulity. This conversation included mention of the name of Kristel and the name of Wachtel. Special Agent Joseph Mangan of the Federal Bureau of Investigation happened to walk past this conversation and overheard the mention of these names. Two other agents were present at the time of the conversation. Tr. at 53. At this point, according to Mr. Truslow's testimony, which I find credible, Mr. Mangan said: "Oh, are you talking about Commercial Envelope?" "Oh, I just had a case in New York involving Ira Kristel and Bill Wachtel and Ira Kristel was my cooperator. He had provided kickbacks to a GSA official in Manhattan...." Tr. at 55.

This conversation led Truslow to two separate files maintained by the F.B.I., Exhibits 2(a) and 2(b), one of which had been opened on March 16, 1984 by Special Agent Mangan and closed on June 8, 1987, and the other which was opened by Special Agent Burt Lacativo on December 4, 1985 and closed on April 3, 1986. Tr. at 65, 71. These files appeared to contain some grand jury material and at least one document which belonged to the United States Attorney for the Eastern District.[1] Tr. at 288–91. Mangan had been the F.B.I. agent assigned to the Wyatt investigation. The files showed that Kristel had bribed Wyatt. This was, however, no secret because the bribery of Wyatt by Commercial Envelope Manufacturing Company had also been the subject of newspaper articles in the *New York Times* on August 10, 1984 and on November 21, 1984.

Mangan told Truslow that "Ira Kristel was very cooperative with him ... and they

---

**1.** The principal office of Commercial Envelope is located in the Eastern District of New York and Wyatt resided in that district.

were able to get the conviction of Ed Wyatt". Tr. at 62.

This Court has not examined the entire files constituting Exhibits 2(a) and 2(b) because there is institutional resistance to making these FBI files available to counsel for defendant, and this Court is reluctant to examine them *in camera* under the circumstances of this case. However, most of the file contents have been made available to defense counsel in this case. The Court infers that these exhibits contain all documentation affecting the Wyatt investigation which ordinarily would be received and maintained by the F.B.I. Special Agent in charge of that case, including some Eastern District Grand Jury materials. This inference is not seriously disputed.

Guided and motivated by all of the knowledge which he had acquired from Eileen and Brian Walsh, his prior telephone conversations with Attorney Wachtel, his visits to the Hudson Valley National Bank and the Bank of New York, as well as his conference with Mangan, Special Agent Truslow called Attorney Wachtel on January 15, 1987 to schedule an interview with Kristel. This resulted in a meeting with Kristel and Attorney Wachtel on February 11, 1987. Prior to the interview he scheduled a second, separate interview with Brian Walsh.

During the first interview which Truslow had with Walsh on December 3, 1986, he learned that until his resignation from Merrill Lynch in September 1985, Walsh had been handling contracts with major suppliers of Merrill Lynch and in his last month of employment at Merrill Lynch he had made up invoices for a fictitious vendor called "Empire Paper and Envelope Company" in the amount of $530,000. This simulated the name of "Empire Envelope Company", which was an actual supplier of Merrill Lynch. The fictitious Empire Paper and Envelope Company checks were sent to the mail drop in White Plains and converted to the use of Brian and Eileen Walsh. The Empire check swindle having been so successful, in October 1986 Walsh essentially attempted to repeat it by the issuance of the two checks to Commercial Paper and

Envelope described above. He was able to do this although he was no longer a Merrill Lynch employee.

The second interview with Brian Walsh was scheduled on February 11, 1987, earlier in the same day as the first interview of Kristel. At that interview, which was also attended by Assistant United States Attorney Margaret Groban and by Mrs. Walsh and their attorneys, Walsh informed Truslow that at the insistence of his superior, John Hennessey at Merrill Lynch, in the Fall of 1986 he had approached Kristel and asked for a payment in the nature of "insurance money" to make sure that Commercial Envelope received a pending bid award to provide some of Merrill Lynch's envelope needs. Commercial Envelope had already won the bid, but Kristel had not yet been informed of this fact.

According to Walsh, Kristel had said he would think about it and thereafter began giving Walsh $15,000 a month by checks to Burke, Wainwright & Evans over a six month period, for a total of $90,000. These payments stopped after May 1985. Of this money, Walsh claimed that he had given $15,000 to Hennessey and had misled Hennessey as to the amount obtained from Kristel. Walsh informed the agent that this money was in the form of corporate checks payable to Burke, Wainwright & Evans. The practice was for Kristel to deliver the checks at lunch with Walsh or at Walsh's office at the World Trade Center in Manhattan. Walsh quotes Kristel, upon his making the first demand, as having said he would think it over, and that Kristel told Walsh "we could work something out". Mr. Truslow also learned through the February 11th interview with Walsh that there had been no contract or invoices to cover the payments to Burke, Wainwright & Evans. *See* Court Ex. 1, Form FD–302 (Brian Walsh), transcribed 2/26/87.

Armed with the information from his interview with Walsh, Special Agent Truslow then went to the office of Gold & Wachtel, where he interviewed Mr. Kristel in the presence of his attorneys. At this point Truslow testified that he expected to be

met with representations by Kristel or his lawyers to the effect that Commercial Envelope had been the victim of coercion or extortion by Walsh. However, by this time Truslow had all of the information from the Walsh interviews and had perused the Mangan file, Exhibit 2(a), and the Lacativo file, Exhibit 2(b). Tr. at 65. He knew that Kristel had committed a prior similar criminal act by bribing Edward Wyatt of the GSA and he also knew that the bribe had been accomplished by issuing checks of Commercial Envelope to a fictitious payee, "Edward Winship". As an interesting aside, Mr. Truslow and the Southern District prosecutors found a similar *modus operandi* by Kristel because payments to a fictitious payee, Edward Winship, were used to bribe Edward Wyatt, using the same first initials, and fictitious payments to Burke, Wainwright & Evans were used to bribe Brian Walsh and Eileen. Tr. at 129–30. However, the Court notes that the Burke, Wainwright & Evans corporation was formed prior to any bribery of Walsh by Kristel, and concludes that the use of real initials of actual recipients for the names of fictitious payees to conceal bribes is not in fact attributable to Kristel or a part of Kristel's *modus operandi*, if he has one.

Because Kristel had responded with the expression "we could work something out", Truslow concluded in his own mind that this response showed an intention to bribe and was inconsistent with being a victim of extortion. Indeed, merely from the fact that the victim negotiates the amount and method of payment of an extortion demand, he infers that the transaction thereby becomes a bribe situation. Tr. at 197. This Court need not comment on the logic of this conclusion, except to note that it is not a crime to submit to extortion and practically all unreported instances of commercial extortion have elements of commercial bribery. In argument on this motion, counsel for Kristel referred to his client as "a willing victim" but one who was "snookered"[2] by Brian Walsh, which is another way of acknowledging that brib-

ery and extortion are part of a single continuum. Tr. at 145.

Before the interview began, Mr. Truslow was aware of the prior similar criminal act of Kristel in bribing Wyatt of the GSA, and also knew that at the very least Kristel had been a "willing victim" in the instant case, as he was in the *Wyatt* case. Therefore, he was surprised by the actual story told on February 11, 1987. Kristel claimed, surprisingly, that Walsh had presented him, in late 1984, with a request to have Kristel use Burke, Wainwright & Evans as an advertising consultant to come up with sweepstakes, catalogs, brochures and individual mailers for a business envelope subsidiary of Commercial Envelope. Kristel proffered that an independent consultant, Ted Snyder, hired to promote this business envelope subsidiary had suffered a heart attack, and was slowing down, so that the business of that subsidiary was "stagnant". Kristel claimed that he believed Walsh was getting a commission from Burke, Wainwright & Evans, but that he nevertheless agreed to pay Burke, Wainwright & Evans $15,000 a month to do promotions for his subsidiary. Kristel stated to Truslow that he was never shown anything that Burke, Wainwright & Evans had worked on, that he trusted Walsh but that he was "snookered." *See* Form FD–302 (Ira Kristel), transcribed 2/19/89.

After this cock and bull story was fed to Agent Truslow in February of 1987, nothing further happened until the pending indictment was returned against Mr. Kristel on October 2, 1990.

### The Rule of Kastigar

In reaching a decision, this Court relies on the United States Supreme Court's decision in *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). The Supreme Court, in *Kastigar*, upheld the constitutionality of the federal use immunity statute, 18 U.S.C. §§ 6002–03, which prohibits the use of "testimony or other information compelled under the

2. "Snooker" is a transitive verb, always used in the passive: to cheat, swindle, deceive. Dictio-

nary of American Slang, Second Supplemented Edition, New York 1975.

[compulsion] order." In reaching this decision, however, the Court stated that:

"[t]he privilege [against self-incrimination] has never been construed to mean that one who invokes it cannot subsequently be prosecuted. Its sole concern is to afford protection against being forced to give testimony leading to the infliction of 'penalties affixed to ... criminal acts.' Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, affords this protection."

*Id.* The Supreme Court cautioned that any grant of immunity must leave the witness and the Government "in substantially the same position as if the witness had claimed privilege." 406 U.S. at 453, 92 S.Ct. at 1661.

■ Accordingly, to the extent that a defendant demonstrates that he testified under a grant of immunity or furnished information under a cooperation agreement concerning matters related to a federal prosecution, the government has "the burden of showing that [its] evidence is not tainted by establishing that [it] had an independent, legitimate source for the disputed evidence." 406 U.S. at 460, 92 S.Ct. at 1665. As the *Kastigar* Court explained: "[t]his burden of proof ... is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Id.* This heavy burden is not satisfied by the prosecution's assertion that immunized testimony or cooperation in *Wyatt* was not used. *United States v. Tantalo,* 680 F.2d 903, at 908 (2d Cir.1982). In the instant case, the Government must demonstrate that Mr. Kristel's immunized testimony was not used "as an investigatory lead, or as a means of focusing [the Government's] investigation on [him]." *United States v. Schwimmer,* 882 F.2d 22, 25 (2d Cir.1989), *cert. denied* — U.S. ——, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1990) (quoting *Kastigar,* 406 U.S. at 460, 92 S.Ct. at 1664–65).

■ While *Kastigar* involved a formal order of immunity, our Court of Appeals has held that the same rules apply to testimony given pursuant to an immunity agreement of the sort entered into with a cooperating individual. *See United States v. Kurzer,* 534 F.2d 511, 513 n. 3 (2d Cir. 1976). *See also United States v. Palumbo,* 897 F.2d 245, 246 (7th Cir.1990) (such informal immunity agreements "are important weapons in the fight against large-scale criminal enterprises," but will be useful "only if each side keeps its end of the bargain").

This Court sees no reason why informal grants of immunity to "cooperating individuals" or "snitches", as they are commonly referred to, should be construed to provide less protection than formal immunity orders. Indeed, it would be absurd to suggest that a witness who has cooperated voluntarily with the Government, as Mr. Kristel has, should be afforded less protection than a witness who is compelled to testify against his will pursuant to an order of immunity under 18 U.S.C. § 6002 *et seq.* Both formal and informal grants of immunity are vital to effective federal law enforcement and the latter will continue to be so only as long as "snitches" are perceived as being treated fairly.

The strength and truthfulness of Mr. Kristel's immunized admissions in the U.S. Attorney's office in the Eastern District resulted in the conviction and resignation from office of a powerful federal official. Apparently, the Eastern District recognized the value of Mr. Kristel's immunized admissions and consensual tape recordings (made at some personal risk) when it failed to respond to the Southern District's informal request to review Mr. Kristel's immunized admissions, to rescind the immunity agreement or prosecute Mr. Kristel for making false declarations (by representing Wyatt was the only person he bribed).

■ In the instant case, the defendant has demonstrated that his prior immunized testimony and information furnished as a cooperator in the Eastern District is factually related to the charges pending in this district and that the Government used his testimony and information as an investigative lead in focusing its investigation, mak-

ing strategic decisions and preparing the prosecution of this case. Agent Truslow testified and I find that initially he believed that Mr. Kristel was the victim of commercial extortion, rather than a commercial bribe giver. Tr. 43, 137–38, 144, 160. The Court also heard evidence and finds that sometime between January 10, 1987 and February 11, 1987 Agent Truslow learned from Agent Mangan that Mr. Kristel had been involved in an investigation in which Mr. Kristel paid kickbacks or bribes to GSA official Edward Wyatt. At or about the same time, Agent Truslow reviewed the Eastern District Mangan and Lacativo files, determined therefrom that Mr. Kristel was a person with a propensity to engage in commercial bribery, as demonstrated by a prior similar criminal act, and then, as a direct result, decided to focus his investigation on Mr. Kristel. The logical inference from this is that the Government might have continued to view Kristel as the victim of extortion, not the target of an investigation, but for Agent Truslow's fortuitous discovery from Agent Mangan of the prior Eastern District case.

The Government has not refuted this inference and, in failing to do so, has not satisfied its burden of showing that it has not used Mr. Kristel's testimony. Thus, this Court concludes that Mr. Kristel's immunized admissions in the GSA matter assisted the Government in deciphering otherwise unintelligible or inconclusive information and evidence, and caused the Government to "focus" its investigation in this matter on Mr. Kristel as a bribe giver, in violation of the principles adopted by the Supreme Court in *Kastigar*.

The Government contends that even if Kristel's immunized testimony motivated the Southern District to focus its investigation on him as a bribe giver, rather than as the victim of extortion, such a use is not prohibited in this Circuit. In support of this argument the Government cites *United States v. Rivieccio*, 919 F.2d 812 (2d Cir.1990); *United States v. Miriani*, 851 F.2d 595, 599 (2d Cir.1988), *cert. denied*, 490 U.S. 1011, 109 S.Ct. 1654, 104 L.Ed.2d 168 (1989).

In *U.S. v. Riviecco*, 919 F.2d 812 (2d Cir.1990), our Court of Appeals "declined to follow the reasoning employed in other circuits that would 'foreclose the prosecution of an immunized witness where his immunized testimony might have tangentially influenced the prosecutor's thought processes in preparing the indictment and preparing for trial.' " *Id.* at 815 (citation omitted). In *Rivieccio*, the defendant was already a subject of the investigation before he gave his immunized testimony and his testimony only confirmed information which the Government had acquired on its own. Thus, the Court concluded that any use by the Government of the immunized testimony "was merely tangential and was therefore not a prohibited use." *Id.* at 815.

Similarly, in *Miriani*, the district court vacated a defendant's conviction for RICO conspiracy and other charges on the ground that the Government had made impermissible, nonevidentiary uses of immunized testimony given by the defendant before a grand jury in deciding not to cross-examine him. The defendant, in *Miriani*, argued only that the Government used his immunized testimony to decide whether to cross-examine him and the Court concluded this was not a prohibited use under the reasoning of *Kastigar*. 851 F.2d at 600. The Second Circuit reversed the district court, finding that the evidence upon which the Government based its prosecution came from legitimate sources, independent of the defendant's immunized testimony. 851 F.2d at 600.

This Court does not read either *Rivieccio* or *Miriani* as supporting the Government's contention that immunized testimony or cooperating information can properly be used as an investigatory lead or as a means of focusing an investigation in light of the Supreme Court's decision in *Kastigar*. In the present case, unlike *Rivieccio* and *Miriani*, there has been no showing that the Government here in this District had prior knowledge from an untainted source, of the information revealed in the Eastern District files. The Government in *Rivieccio* and *Miriani* had established that it had prior knowledge of substantially all of the information covered by the immunized tes-

timony, thereby foreclosing the possibility that it made "any use, direct or indirect, of the compelled testimony and any information derived therefrom." 406 U.S. at 460, 92 S.Ct. at 1664. Thus, the Government's reliance on *Rivieccio* and *Miriani* is misplaced.

Moreover, in the instant case, Mr. Kristel's immunized testimony more than tangentially influenced the prosecution. As this Court concluded above, the Government used the immunized testimony or co-operating information of Mr. Kristel as an investigative lead to focus its investigation. It was not until the discovery of Mr. Kristel's cooperation and immunized testimony and the Eastern District files that Agent Truslow began to focus the Government's investigation on Mr. Kristel as a bribe giver and gather evidence against him. There is no question but that Mr. Kristel's immunized testimony about bribing Wyatt in the Eastern District set in motion the events which ultimately resulted in his indictment in the Southern District.

In addition to using the immunized testimony of Mr. Kristel to focus the investigation, the Government used Mr. Kristel's immunized testimony in questioning witnesses who later testified before the grand jury and as a lead to discover other evidence. Agent Truslow's 302 reports revealed that in the course of interviewing over 200 people regarding the Southern District investigation, Special Agent Truslow discussed, at least in some part, information concerning Mr. Kristel's involvement in the Eastern District *Wyatt* matter to focus the thoughts of witnesses and refresh their recollection. Tr. 237–38, 240–41, 243. This type of use of immunized testimony is clearly prohibited by *Kastigar* and its progeny.

A greater degree of doubtfulness attaches to Mr. Kristel's contention that the Government introduced Mr. Kristel's immunized testimony before the grand jury that ultimately returned this indictment on October 2, 1990. While reluctant to do so [3], this Court has reviewed *in camera* the transcripts of witnesses who testified or whose prior grand jury testimony was read before the grand jury that returned this indictment and concludes that there was no mention of Mr. Kristel's immunized testimony before the grand jury.

The only meaningful reference to the GSA matter is contained in the testimony of Brian Walsh which has been made available to defense counsel in this case. Grand Jury Tr., July 31, 1990, at 22. When asked by the Assistant whether he had ever discussed "a news article of Kristel," Brian Walsh testified before the grand jury that he had discussions about "an article about Commercial Envelope being involved with some sort of kickback scheme with some section of the federal government." *Id.* A copy of the news article was actually found in Exhibit 2(a) or 2(b). While it is difficult, if not impossible, to determine whether the memory of this witness was refreshed by the Government's reference to the immunized testimony of Mr. Kristel or Eastern District Grand Jury materials, it may be that the Government cannot excuse its actions on this basis alone.

This Court finds persuasive the reasoning of the D.C. Circuit panel in *United States v. North*, 910 F.2d 843, 860 (D.C.Cir. 1990). The Court, in *North*, remanded for a *Kastigar* hearing on the defendant's allegations that his immunized testimony was used to refresh the memory or focus the thoughts of witnesses. The Court found that "the use of immunized testimony by witnesses to refresh their memories, or otherwise to focus their thoughts, organize their testimony, or alter their prior or contemporaneous statements, constitutes indirect evidentiary not nonevidentiary use." *Id.* at 860. The Court in *North* concluded that if it proves impossible to separate the witnesses unspoiled testimony from that

---

**3.** *In camera* review ought to be avoided as inconsistent with our adversarial tradition of criminal justice. It is difficult to argue a motion effectively before a judicial officer in possession of some information learned secretly, the scope and content of which can only be imagined; also an *in camera investigation* of extensive and sometimes vague materials may result in a failure to understand or appreciate the significance of evidence unless both adversaries are able to present their own analysis to the court after having seen the materials.

tainted by exposure to the immunized testimony, then it may be that the prosecution cannot proceed since *Kastigar* prohibits any use, direct or indirect.[4]

This Court is convinced that the use of the immunized testimony or cooperating information of Mr. Kristel played an important part in the Government's decision to investigate and prosecute Mr. Kristel, almost four years after it began its original investigation of Eileen and Brian Walsh. And so the Court must conclude that the Government's investigation and decision to prosecute was affected, at least in part, by what it had learned from Mr. Kristel's immunized testimony and digging through the Eastern District FBI files which included at least some Grand Jury material from the *Wyatt* case.

Accordingly, the Court concludes that this indictment should be and it hereby is dismissed.

So Ordered.

4. That Ollie North was a patriotic albeit misguided citizen while this movant is just an ordinary crooked businessman will not support a distinction between *North* and the instant case.